# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## JAMES CLINTON v. COMMONWEALTH.

January 11, 1934.

Present, All the Justices.

The opinion states the case.

*James T. Gillette,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HOLT, J.,[1] delivered the opinion of the court.

In this case the accused stands convicted of first degree murder.

This certificate of fact appears in the record:

"On the morning of the tenth of May, 1932, Vernon Wilson Jones, the deceased, an officer of the town of Franklin, Virginia, found five bags of peanuts about twenty feet from the county road near Franklin cemetery. While Officer Jones was there with the peanuts James Clinton came up and said that the peanuts were left there by his brother, who lived on the farm of Job Harrell, who lived on the Cypress Bridge road, when his (meaning his brother's) wagon broke down; that he, James Clinton, came there to get the peanuts for his brother. Officer Jones then went to Franklin, about a half-mile away, followed by Clinton. After a short time Officer Jones returned to the scene of the peanuts with W. E. Darden, chief of police of Franklin. In a short time Clinton also returned to the scene of the peanuts and talked there with Officer Jones, Chief Darden and Mr. Elmer Bradshaw, who had appeared on the scene just before that time. They talked about the peanuts. Mr. Darden, the chief of police of Franklin, Virginia, told Jones that there were no reports on any stolen peanuts nor any stolen cars and that he would not fool with it further.

"Clinton told Jones to go with him near Courtland down the Cypress Bridge road, by the Joyner Service Sta-

---

[1] By reason of circumstances over which the court had no control, it became necessary to reassign the task of preparing this opinion. This accounts for the delay in deciding the case.

tion and he would there prove the ownership of the peanuts. Clinton got in his own car and drove off in front of the car driven by Mr. Bradshaw, in which Officer Jones rode. Just before Clinton got to the Joyner Service Station at the intersection of the Cypress Bridge road with the Franklin-Courtland highway, Bradshaw and Jones drove their car past the Clinton car and Jones demanded that Clinton stop at the service station. Both cars stopped at the service station. Jones went into Joyner's Service Station and asked Mr. Joyner if a Mr. Job Harrell lived on Cypress Bridge road (which road ran by Joyner's station). Joyner said no such man lived on this road and that he didn't know Mr. Job Harrell. Then Jones said, speaking to James Clinton: 'Put your car on the side of the road and get in my car and go with me to Courtland.' All of which was done without one word from either party. Then and there Clinton got in the Jones car and rode on the front seat beside Mr. Bradshaw, the driver; Mr. Jones was riding on the rear seat. They rode together up the road towards Courtland about two miles until they came near another service station owned by Andrew Sipiscky. As they approached the Sipiscky station, Jones said: 'We will take you to Mr. "Bossie" Bell. Do you know Mr. "Bossie" Bell?' Clinton replied, 'I know "Bossie" Bell very well.' At once Clinton drew his pistol from his shirt and fired at Jones, killing him with one shot. Then he turned to fire on Bradshaw. Bradshaw overpowered Clinton and took the gun away from him. Just at that time Jones fell over in the back seat and Clinton reached over and took Jones' gun from the deceased officer's pocket. Bradshaw then began to shoot at Jones and shot him three times. He tried to shoot the fourth time, but his gun snapped. Thereupon Bradshaw ran around the Sipiscky Service Station. At that moment Clinton got out of the car on his left-hand side, ran around the car and shot at the fleeing Bradshaw. As Clinton passed Sipiscky, who was standing in the door of his service station, he fired a shot in his direction and ran away. (Brad-

shaw said that Clinton fired one shot and Sipiscky said Clinton fired two shots.)

"Jones was an officer of the town of Franklin and had on an officer's uniform at that time. He also wore an overcoat.

"Jones had no warrant of arrest for Clinton nor did he have any warrant of any kind for any person."

Just after Clinton shot Jones he turned to fire on Bradshaw. Bradshaw overpowered him and took his gun away. Clinton then reached over and took Jones' gun from the deceased officer's pocket. Then follows this recitation: "Bradshaw then began to shoot at Jones and shot him three times." It is plain that there is some error here in names, but there is no confusion about the statement we just made. Both of these men then jumped from the car and Clinton shot at Bradshaw as he ran.

 Error is assigned to this instruction, numbered 7, and given on behalf of the Commonwealth:

"The court instructs the jury that malice aforethought necessary to constitute the crime of murder may be either expressed or implied. The word 'malice' is used in a technical sense, and includes not only anger, hatred and revenge, but every unlawful and unjustifiable motive. It is not confined to ill will to any one or more particular persons, but is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of a heart regardless of social duty and deliberately bent on mischief; therefore, malice is implied by law from any wilful, deliberate and cruel act against another, however sudden."

The accused contends that in no circumstances can malice be implied where the homicide follows an unlawful arrest.

The instruction itself embodies settled principles of law. *Scott* v. *Commonwealth,* 143 Va. 510, 129 S. E. 360; *Horton's Case,* 99 Va. 848, 38 S. E. 184. When the Common-

wealth has shown deliberate killing it has made out a case of murder. The accused may reduce the grade of the offense, and justify or excuse it in many ways. He may show, for example, that he was unlawfully arrested, but the burden of doing these things is upon him. All of this the court told the jury in Instructions 2, 4 and 5. They read:

"2. The court instructs the jury that every homicide is presumed in law to be murder in the second degree, and punishable by confinement in the penitentiary; and in order to elevate the offense to murder in the first degree, the burden of proof is on the Commonwealth; and to reduce this offense to manslaughter the burden of proof is on the prisoner.

"4. The court instructs the jury that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any, or upon very slight, provocation, is, *prima facie,* wilful, deliberate, and premeditated killing and throws upon the accused the necessity of proving extenuating circumstances.

"5. The jury are instructed that a man is presumed to intend that which he does or which is the immediate or necessary consequences of his act; and if the prisoner, with a deadly weapon in his possession, without any or upon very slight provocation, gave to the deceased a mortal wound, he, the prisoner, is, *prima facie,* guilty of wilful, deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree.

The Commonwealth might have shown that as Jones drove quietly down the road with Clinton, Clinton turned and shot him. If this were all no other verdict than murder could properly have been returned. Of it malice is a necessary ingredient. It is not necessary for us to discuss here distinctions sometimes academic between the burden which rests upon the Commonwealth in criminal

cases and evidence which it is necessary for the accused to introduce.

In *Puckett* v. *Commonwealth,* 157 Va. 800, 160 S. E. 19, 21, Mr. Justice Campbell said: "In Virginia, murder is either murder in the first degree or murder in the second degree. Every unlawful homicide is, with us, murder in the second degree and the burden is on the Commonwealth to elevate the offense to murder in the first degree. If the accused seeks to reduce the offense to manslaughter, the burden is upon him." See, also, Wharton's Crim. Ev. (10th Ed.), p. 1823. For practical purposes we must follow here the rule laid down in *Puckett's Case.*

These instructions tendered on behalf of the accused were rejected:

"2. The court instructs the jury that the killing of an officer, or other person, by a person resisting an unlawful arrest in the heat of passion, the killing is manslaughter and not murder."

There is nothing in the record which indicates "heat of passion" and though this instruction in certain circumstances embodies an accurate statement of the law, there is no fact here to support it.

This is rejected instruction numbered 3:

"The court further tells the jury that if they believe from the evidence in this case that Jones arrested Clinton, without a warrant of arrest, when no misdemeanor was being committed in his presence and no reasonable cause to think that a felony had been committed, and in resisting the arrest, Clinton killed Jones in the heat of passion, then the killing was manslaughter, and punishable by confinement in the penitentiary not to exceed five (5) years."

It should have been rejected. There is nothing to show "heat of passion."

This is rejected instruction numbered 5:

"The court tells the jury that constables or police officers may arrest persons without a warrant for felonies, or upon reasonable suspicion of felony, and for misde-

meanors committed in their presence, and take the offenders before the magistrates to be dealt with according to law."

This is but a general statement and does not touch the issue.

██ In rejected instruction numbered 10, the court was asked to tell the jury "that in resisting an unlawful arrest, prisoner may rely on the presumption that his mind was beclouded by passion, and the Commonwealth must prove actual malice."

The *Muscoe Cases* are strongly relied upon. He was twice convicted of first degree murder. His first appeal appears in 86 Va. 443, 10 S. E. 534, 535, and his second in 87 Va. 460, 12 S. E. 790. The officer shot had no right to arrest him. These are the facts under which he was apprehended (86 Va. 443, 10 S. E. 534):

"The deceased met the prisoner on the street about dark, the evening of the homicide, and stopped him in the presence of the witness, Fry, who testified that the deceased asked him (the witness) if the prisoner was the man who took the cuff buttons. The witness looked the prisoner in the face and answered that he was. This the prisoner denied, saying he had only come to the city that day. To which the witness replied: 'You have been here two or three weeks.' He (the prisoner) then started on his way, when the deceased ordered him to stop, and to go with him to 'see about the matter,' at the same time taking hold of him by the coat. The prisoner, however, refused to go, and jerked back. Then the deceased took out his 'nippers' (handcuffs); whereupon the prisoner drew a pistol and fired, inflicting upon the deceased a mortal wound."

In his first case the court told the jury: "That a police officer has no right to arrest a person without a warrant, unless it be for an offense committed in his presence, or where he has cause to suspect a felony has been committed, *or in pursuance of legal ordinances of the city* of whose police force he is a member, empowering him to

make such an arrest in some specified case." This Lewis, P., said was error. A policeman has no general power to arrest "in pursuance of the legal ordinances of the city."

The court also told the jury: "That a police officer acting beyond the scope of his authority in making an arrest, is a trespasser, and a person is authorized to resist an unlawful arrest, whether the attempt be made by a police officer or a private citizen; but *the jury must decide from the evidence whether the attempted arrest is unlawful or not.*"

It said that the trial court should have told the jury what was a legal arrest and not have left that question to its unguided discretion. Then follows this comment: "If the arrest was legal, the prisoner had no right to resist it; if it was illegal, he had. A person undoubtedly has a right to resist an illegal arrest; and if in so doing he kills the person who undertakes to arrest him, he is guilty of manslaughter only, unless the circumstances show malice, in which case he is guilty of murder—for the law excuses the act only to the extent that it is presumed the accused acted, not with malice, but from the excitement of the moment."

Muscoe was again tried and again sentenced to be hanged. That sentence was affirmed (87 Va. 460, 12 S. E. 790, 792). The trial court added this to one of the instructions tendered: "But if the killing be with a deadly weapon, and be done in a very cruel manner, not at all justified by the nature of the arrest, the inference would be that malice, not passion, impelled the blow, making his crime murder." Upon appeal this court said that while the instruction was open to criticism and perhaps should not have been given, yet upon the record it was plain that the prisoner was not prejudiced. It is possible that Muscoe was still moved by passion when he shot. Clinton's crime was far more deliberate, and so, if that instruction was not error in *Muscoe's Case,* for a stronger reason the principles there applied would apply here.

In *Briggs* v. *Commonwealth,* 82 Va. 554, it appears that the deceased was a constable who undertook without warrant to arrest Briggs, and in attempting to do so caught hold of him and pulled him into the street. Briggs pulled loose, shot the officer and killed him. He was convicted of second degree murder. His conviction was affirmed. The court said: "The deceased was without authority to make the arrest, and the plaintiff in error was not bound to submit to an unauthorized arrest," and in support of that statement cited Mr. Bishop to this effect:

"If one, even an officer, undertakes to arrest another unlawfully, the latter may resist him. He has no protection from his office, or from the fact that the other is an offender. But the doctrine already stated (sections 863, 868) that nothing short of an endeavor to destroy life will justify the taking of life, prevails in this case; consequently, if the one to be arrested kills the officer or private individual in resisting he commits thereby the lower degree of felonious homicide called manslaughter." 1 Bish. Crim. Law, section 868.

The court then proceeded to add this wholesome limitation to Mr. Bishop's broad statement:

"This doctrine, however, must be qualified by the consideration of the existence of malice, or an impulse of sudden passion, as in cases of homicide in self-defense, and by the principle which compels every man to avoid, as far as possible, the extreme necessity to take life. If, upon being assaulted, the passion of the assaulted person became greatly excited, and under that impulse he kill his assailant, though it be with a deadly weapon, the offense is manslaughter only. Yet should his resistance with a deadly weapon be made in a very cruel manner, not at all justified by the nature of the assault, the inference would be that malice, not passion, impelled the blow, making his crime murder."

It simmers down to this: In cases of homicide a defendant who has been illegally arrested may successfully interpose that defense only when he acts in hot

blood induced by the indignity which has been offered him. This rule as stated in the *Briggs Case* finds elsewhere ample support.

In *Roberson* v. *State,* 43 Fla. 156, 29 So. 535, 539, 52 L. R. A. 751, the court said: "An illegal arrest is deemed in law a great provocation, and if conceded, to constitute adequate cause; yet, to reduce a killing in resisting such arrest to manslaughter sudden passion must have existed in the mind of the slayer at the time of the homicide, otherwise the killing is murder. In such a case adequate cause and sudden passion must concur." See, also, *Sanders* v. *State,* 181 Ala. 35, 61 So. 336.

"A malicious and deliberate killing of an officer is murder to which it is no defense that the officer was at the time endeavoring to arrest on defective or void procedure the defendant or his friends." Wharton on Crim. Law (8th Ed.), section 414; 2 R. C. L. 475.

The accused contends that when Jones said, "Put your car on the side of the road and get in my car and go with me to Courtland" he was then and there under arrest. Let us assume that this is true. Clinton made no objection whatever. He did as he was asked to do. There is nothing in the record that even hints at reluctance. They then rode quietly on for two miles until they reached Sipiscky's Service Station, when Jones said: "We will take you to Mr. 'Bossie' Bell. Do you know Mr. 'Bossie' Bell?" Clinton replied: "I know 'Bossie' Bell very well." Thereupon without protest and without warning he instantly shot and killed him. No jury could have believed that this was remotely due to the indignity of arrest or to sudden passion.

"To admit, however, the application of this doctrine there must be evidence, not only that there was an illegal arrest, but that the killing was done in actual resistance to the act of making the arrest or maintaining the illegal custody of the defendant." *People* v. *Gilman,* 47 Cal. App. 118, 190 Pac. 205, 207.

Before the defense of an illegal arrest can be interposed it must appear that the killing was done *dum fervet opus,* and that does not here appear.

Next it is said that it is improper to admit any evidence of the conduct of the accused after he had killed Mr. Jones. As Clinton ran from the car he shot at Bradshaw and shot also in the direction of Sipiscky. It was competent as part of the *res gestae* and it shows a purpose on his part to shoot anyone who might interfere with his escape. *Boyd* v. *Commonwealth,* 156 Va. 934, 157 S. E. 546; *Rhodes* v. *Commonwealth,* 145 Va. 898, 134 S. E. 723; *Trogdon* v. *Commonwealth,* 31 Gratt. (72 Va.) 862. Indeed we cannot imagine anything more intimately connected with the homicide than things done by the prisoner instantly in his attempt to escape.

Finally it is said that the prisoner was not present throughout his trial. This statement of facts shows what was done:

"All the evidence in the case was completed by lunch time. The judge adjourned court and the sheriff took the accused back to jail. During the lunch hour, while the accused was in jail, the court considered the instructions offered by the Commonwealth and the attorney for the accused, and after hearing argument, pro and con, marked on the instructions his notations, either allowing or refusing. During that time the judge heard all the objections made by the attorney for the accused and passed on the instructions.

"After the lunch hour the court reconvened, the sheriff brought the prisoner in court and then the court read to the jury, in the presence of the accused, the instructions that he had decided upon and on which he had made his notations."

The situation here does not differ in its essentials from that in *Hagood* v. *Commonwealth,* 157 Va. 918, 162 S. E. 10, 601. For reasons there stated this objection is not well taken.

We find no error in the record. The judgment appealed from must be affirmed, and it is so ordered.

*Affirmed.*

CHINN, J., concurring:

██ I am constrained to concur in the result reached in the foregoing opinion for the reason that the record fails to show that any exception whatever was taken by the accused to the rulings of the trial court in granting the instructions given at the instance of the Commonwealth, or in refusing the instructions asked for by the accused; otherwise, I think the accused should be granted a new trial upon the ground, if no other, that the accused was entitled to instruction number 3, as asked for.

The opinion sustains the refusal of the trial court to give this instruction upon the ground that there is no evidence upon which to base it. It appears from the facts certified that the accused shot Jones immediately upon being told by the deceased that he was taking him to "Bossie" Bell; that said "Bossie" Bell is the sheriff of Southampton county, and that the accused knew this. Up to that time, as far as the record discloses, the accused did not know, and had no reason to suppose, that Jones had placed him under arrest. On the other hand, it may be reasonably inferred from the facts that the accused understood he was accompanying Jones to assist him in investigating the ownership of the peanuts.

In view of these facts, the determination of the degree of the homicide was a question for the jury and not for the court. *Jacobs* v. *Commonwealth,* 132 Va. 681, 111 S. E. 90.

It appears from the record that at the instance of the Commonwealth the court gave eight instructions, all of which were predicated upon the theory that the killing of Jones by the accused was, *prima facie,* deliberate and premeditated. The instructions offered by the accused were predicated upon the theory that the homicide was

committed in resisting an illegal arrest, and, therefore, committed without premeditation and under circumstances of provocation. The refusal of the court to give any of these instructions resulted in leaving entirely out of consideration by the jury the fact of the illegal arrest and any extenuating circumstances which might have been found by the jury on that account.

I, therefore, think that Instruction 3, at least, should have been given, and that the court's refusal to give it would entitle the accused to a new trial if the proper exceptions had been taken.

EPES, GREGORY and BROWNING, JJ., concur in the views expressed by CHINN, J.