# Richmond

## Frances M. Martin v. Commonwealth.

March 4, 1946.

Record No. 3052.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and
Spratley, JJ.

The opinion states the case.

*William W. Butzner* and *DuVal Q. Hicks, Jr.,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

The plaintiff in error, Frances M. Martin, was indicted for the murder of her husband, Everett H. Martin. She was tried by a jury and found guilty of murder in the second degree, and her punishment fixed at fifteen years in the penitentiary.

The facts are not in dispute and, stripped of unessential details, may be summarized as follows:

Mrs. Martin and her husband, with their infant child, lived in an humbly furnished dwelling in the city of Fredericksburg, Virginia, consisting of two rooms and a hall on the second floor and two rooms and a hall on the first floor. Mr. and Mrs. L. L. Light rented and occupied one of the bedrooms on the second floor and used the kitchen facilities on the first floor with the Martins.

In the forenoon of March 9, 1945, the day of the homicide, some unpleasant words were passed between Mr. and Mrs. Martin relative to Mrs. Martin's desire to have her husband wash or paint a kitchen shelf. After dining together in the evening, and after Martin had smoked a cigarette, he got some hot water from his wife and washed the shelf. Subsequently Mrs. Martin put her infant son to bed. She and her husband then went out together for the purpose of borrowing a dollar to go to a moving picture show. They were unable to borrow the money, and after talking with some friends and declining an invitation to go to a friend's house for a drink, they returned home. In their quarters at the home, they found Mr. and Mrs. Light and Henry G. Burnett. Each of these persons took a drink of liquor. Martin turned on the radio, and danced with his wife, both apparently in a gay and friendly humor. Every one then had another drink, and Martin and his wife danced together again. When the music stopped, Mrs. Martin and her husband sat on a cot in the room and Martin lay partly across her lap, and the two engaged in conversation. None of the other persons was attracted by their conversation, except to some words with reference to a red-headed woman. No one suspected any trouble between them until Martin suddenly left the room after

Mrs. Martin said, "If I had a gun, I would kill you." Martin replied, "I don't believe you would shoot me." He then went upstairs and returned to the room with a gun. Up to this time, each of the other parties present still thought that the conversation was in a spirit of fun. All of the parties agree that no one had become intoxicated. However, when Martin returned with the shotgun and gave it to his wife, Mrs. Martin asked her husband, "How do you open this thing?" Light then went out to the hall, his wife remaining in the room. In response to Mrs. Martin's question, her husband opened the gun and gave her a shell. She put the shell in the gun and closed it. Almost immediately thereafter there was an explosion from the gun in the hands of Mrs. Martin, and her husband fell to the floor and died in a few moments.

An examination of his body showed that the shot was fired into the body of the deceased at close range. There was a wound on the left side of the body just below the heart and powder burns on his outer clothing. He died from internal hemorrhage and shock.

During the examination of A. G. Kendall, superintendent of police of the city of Fredericksburg, he undertook to describe the powder burns on the sweater worn by the deceased. In this connection, the Commonwealth, over the objection of the defendant, offered in evidence a photograph of the deceased's body showing the body from the chin to the knee. This photograph, taken a few minutes after the deceased was shot and before his body was moved, showed a powder burn on the sweater and a hole made by the shot.

Mrs. Martin did not testify; but in her voluntary written confession made shortly after the killing, she made the following statement to a police officer:

"When we got home which was about 9:20 P. M. we found Mr. Burnett with Mrs. Light and they asked us to have a drink. Mr. Burnett had a pint of Paul Jones whiskey. Everett and I had a drink and Everett turned on the radio and he and I started to dance. We danced for a while and

Mr. Light came in. Mr. Light was asked to have a drink and we all had another drink. Everett and I started to dance again. We drank the pint of Paul Jones and Mr. Burnett and Mr. Light went out and got a fifth of whiskey, I don't know what brand it was as I didn't notice. Everett and I sat on a cot we use as a day bed in the front room side by side and he began accusing me of running with other men. I told him he had no reason to say anything as he was doing as much as I have ever done. I said 'You are running with a woman who is living with her husband and has six children right now.' He got mad and called me a goddam common bitch and a goddam common *hore*. I said: 'Everett, I have stood as much as I can stand, shut up.' He kept fussing, I don't know just exactly what he said. I asked him again to please shut up that I couldn't stand any more. I said, 'So help me God if I had a gun I would shoot you.' He said: 'Goddam you, you'll have a gun,' or words to that effect. I don't recall his exact words. Without another word he rushed upstairs. I lost complete control of myself. I asked those in the room to leave. No one left except Mr. Light and as he left the room Everett came in with a 16 gauge single barrel shot gun and handed it to me. I *did'ent* know how to open the gun so Everett showed me how, in fact he opened the gun for me and handed me a shell, I knew the gun was not loaded because it was not kept loaded. I put the shell in the gun and closed it. Everett started to saying 'shoot me, goddam you shoot me.' He walked to within six inches of the barrel. I *did'ent* realize what I had done until I heard the sound of the gun. Everett fell on the floor and I threw the gun beside him and rushed over to the home of Mrs. Seay who lives across the street from me and I called the police. I went back home and got my baby. * * * I regret what I have done for only one reason, I have broke God's commandments, 'Thou Shalt Not Kill.'

"I had about four or five drinks from about 9:30 P. M. up to the time I shot my husband but I was not drunk."

At the request of the Commonwealth, the court gave,

without objection, several instructions, which exhaustively and comprehensively defined murder in the first and second degree, voluntary and involuntary manslaughter, and assault, and distinguished the requirements as to each.

At the request of the defendant, the court also gave a number of instructions, including the following:

"That in order for the killing to amount to murder in the first degree it must involve on the part of the prisoner wilfulness, deliberation and premeditation, with malice aforethought, and if the Commonwealth has not proved such beyond all reasonable doubt, then the prisoner cannot be guilty of that crime.

"That in order for the killing to amount to murder in the second degree, it must involve on the part of the prisoner malice, though not necessarily wilfulness, deliberation and premeditation. If the Commonwealth has not proved such beyond all reasonable doubt, then the prisoner is not guilty of that crime.

"That in order for the killing to amount to voluntary manslaughter, such killing must involve on the part of the prisoner an intentional act, but without malice, such as upon sudden heat of passion, and if the Commonwealth has not proved such beyond all reasonable doubt, then the prisoner cannot be guilty of that crime.

"That in order for the killing to amount to involuntary manslaughter, it must involve on the part of the prisoner a killing, contrary to intention, in the prosecution of some unlawful but not felonious act, or in the improper performance of a lawful act. If the Commonwealth has not proved such beyond all reasonable doubt, then the prisoner cannot be guilty of that crime.

"The Court instructs the jury that the burden is upon the Commonwealth to prove beyond all reasonable doubt every fact or circumstance necessary to convict the accused, Frances M. Martin, of the offense with which she is charged; and if they have any reasonable doubt as to any fact or circumstance necessary to convict the accused, Frances M. Martin, as aforesaid, they are bound to give her the benefit

of such doubt and find her not guilty; and the Court tells the jury that a reasonable doubt is,

" 'That state of the case which, after the entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certainty of the truth of the charge.' "

After hearing the argument of counsel and deliberating for some time, the jury returned to the courtroom and requested the trial judge to instruct them as to the meaning of the word "malice." Counsel for the defendant objected to the giving of any instruction on "malice," contending that "malice" was not capable of definition, and moved the court to so tell the jury or to refuse to answer their question. The court overruled the motion and thereafter gave the following written instruction:

"The Court instructs the jury that the malice necessary to constitute the crime of murder may be either express or implied. The word 'malice' in the foregoing definitions of murder is used in a technical sense, and includes not only anger, hatred and revenge, but every unlawful and unjustifiable motive. It is not confined to ill will to any one or more particular persons, but is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of a heart regardless of social duty and deliberately bent on mischief: therefore malice is implied by law from any wilful, deliberate and cruel act against another however sudden."

As originally presented, the word "aforethought" followed the word "malice" in the first line of the instruction. Upon objection by the defendant to this word, it was stricken out, leaving the instruction as quoted above. The defendant then objected and excepted on the grounds that the instruction was "prejudicial to the accused, misleading, confusing and did not accurately state the definition of malice." No other objection was assigned at that time.

Upon the return of the verdict, the defendant moved to set it aside on two grounds, first, because of the erroneous admission in evidence of a photograph of the body of Martin showing where the shot entered the body, and, second, for error in giving the instruction defining "malice." On the argument of the motion to set aside the verdict, it was contended, for the first time, that the instruction was erroneous, because there was not added thereto the following language: "Thus on a charge of murder, malice is presumed from the fact of the killing, when the killing has been proven, and is unaccompanied by circumstances of palliation, and the burden of introducing evidence to rebut such presumption rests upon the accused."

In her assignments of error, the defendant relies upon the foregoing grounds assigned in the lower court, and the further ground that the verdict of the jury is contrary to the law and the evidence, and without evidence to support it.

Undeniably, Mrs. Martin shot and killed her husband. Upon the uncontradicted evidence of the Commonwealth, there arose the presumption that the defendant was guilty of second degree murder, unless it disclosed that there were sufficient circumstances of palliation to reduce, as a matter of law, the offense of murder to manslaughter.

There was shown no element of self-defense or unavoidable accident, or unintentional homicide resulting from a merely negligent or careless act. The only question with reference to the sufficiency of the evidence to support the verdict is whether the circumstances, on their face, show sufficient palliation to reduce, as a matter of law, the homicide from murder to manslaughter. To thus reduce the offense charged, it must appear that the killing was done in the heat of passion and provoked by adequate legal provocation. Both passion and adequate provocation must occur to reduce the offense. *Jacobs* v. *Commonwealth*, 132 Va. 681, 111 S. E. 90; *Ballard* v. *Commonwealth*, 156 Va. 980, 159 S. E. 222; and *Mosby* v. *Commonwealth*, 168 Va. 688, 190 S. E. 152.

It has long been the settled rule in Virginia that words

alone, however grievous or insulting, cannot justify taking human life with a deadly weapon, nor reduce the grade of such a homicide below murder, or excuse the same. *McCoy v. Commonwealth*, 133 Va. 731, 112 S. E. 704; *Harris v. Commonwealth*, 134 Va. 688, 114 S. E. 597.

The governing rule or principle has been clearly stated by Moncure, P., in *Read v. Commonwealth* (1872), 22 Gratt. (63 Va.) 924, as follows:

"*A reasonable provocation is always necessary to reduce a felonious homicide, committed upon sudden provocation, from the degree of murder (which is its presumed degree), to that of manslaughter; and especially where the offense is committed with a deadly weapon. Words alone, however insulting or contemptuous, are never a sufficient provocation to have that effect, at least where a deadly weapon is used, so tender is the law of human life, and so much opposed is it to the use of such a weapon.*

"It is not only necessary in such a case and for such an effect that a reasonable provocation should be received, but it is also necessary that the provocation should have the effect of producing sudden passion, under the influence of which alone the offense is committed. It must be a sudden transport of passion, which the law calls *furor brevis*. If a person on receiving the gravest provocation is unmoved by passion, but wantonly and wilfully and wickedly kills his adversary otherwise than in self-defense, he is guilty of murder. The law mitigates the offense to manslaughter only as an indulgence to the infirmity of human nature. *Provocation without passion or passion without provocation will not do; both must concur to reduce the offense to the grade of manslaughter.*" (Italics supplied.)

To the same effect, Kelly, P., said in *McCoy v. Commonwealth, supra*:

"The provocation recognized by the law as sufficient to engender the heat of passion, the *furor brevis*, which reduces what would otherwise be murder to manslaughter, requires something more than mere personal insult, however grievous the insult be. There must not only be a sudden

heat of passion, but there must be a reasonable, or, as the books perhaps more frequently designate it, adequate provocation, and the law is so tender in its regard for human life that it does not permit a man to defend himself against the charge of murder, especially when he has used a deadly weapon and clearly intended to kill, unless his victim has done something more than to merely offer him a verbal insult."

This case may be readily distinguished from *Roark* v. *Commonwealth*, 182 Va. 244, 28 S. E. (2d) 693. The homicide in that case resulted from a blow with the bare fist, inflicted in a fight brought on by the insulting words of the deceased. Death is not usually caused by a mere blow with the bare fist. Ordinarily, the fist is not regarded as a dangerous weapon and, therefore, it was held that, under ordinary circumstances, no "malice" may be inferred from a blow of the fist, even though death results, unless it be further shown that the assault was attended with such circumstances of violence and brutality that an attempt to kill may be presumed. While it was there said that insulting or contemptuous words may, under certain circumstances, offer provocation for a fist fight, nothing was said to indicate a departure from the long established rule that such words alone are never a sufficient provocation where the homicide is caused by the use of a deadly weapon.

In the present case, it appears that before the original threat of the defendant to kill her husband could be effected, it was necessary for her husband to leave the room, go upstairs and procure a gun, bring it back downstairs, hand it to her, show her how to break it, and hand her a shell. The defendant, then with some time to "cool off" after the original insult, deliberately loaded the gun and pulled its trigger. She makes no explanation of her act, except to say that she did not realize what she had done until she heard the explosion of the shell. She expresses no regret, save that she had broken one of the Ten Commandments. She stated no just cause or excuse for the killing.

■ Invitation and consent to the perpetration of a crime

do not constitute defenses, adequate excuses, or provocations.

"If the doing of a particular act is a crime regardless of the consent of anyone, consent is obviously no excuse. It follows, therefore, that consent of the deceased is not a defense in a prosecution for homicide. The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable." 26 Am. Jur. (Homicide, section 103) p. 227.

The defendant does not now contend that the term "malice" is incapable of definition. She relies upon her objection that the definition given "was misleading, confusing, and did not accurately state the definition of malice." In the trial court, at the time the instruction was given, the objection was stated in broad generalities. It was not until after the verdict of the jury that she complained that the additional sentence should have been added. She failed to state, or point out, with reasonable certainty, the specific deficiency in the instruction at the proper time, as required by Rule XXII of this court. However, we think, under the evidence and the circumstances stated and the principles of law applicable, the omission of the additional sentence did not constitute error prejudicial to the defendant.

The definition of "malice", both with and without the additional sentence, has been heretofore considered by us.

In *Wright* v. *Commonwealth*, 109 Va. 847, 65 S. E. 19, the instruction without the suggested addition was approved.

In *Wallen* v. *Commonwealth*, 134 Va. 773, 114 S. E. 786, the defendant contended that the addition of the sentence was detrimental to the defendant. He objected to the sentence for the reason that it emphasized the burden placed on the defendant to introduce evidence to rebut the presumption of malice resulting from a homicide. We held that it was not error to include the sentence in the instruction.

In *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360, it was held that the instruction with the addition was proper.

There was no contention that without the addition it would have been erroneous.

In *Clinton* v. *Commonwealth*, 161 Va. 1084, 172 S. E. 272, the instruction defining malice was identical with the one in the present case, that is, it did not include the additional sentence mentioned. There the defendant had objected to the instruction for the specific reason that malice could not be implied where the homicide followed an unlawful arrest. Mr. Justice Holt there said: "The instruction itself embodies settled principles of law." It was held that there was no error; that the burden of excusing or reducing the grade of the offense rested upon the defendant; and that the other instructions in the case told the jury these principles. The principles found in the other instructions in that case, insofar as they are applicable to the facts in this case, are likewise found in the present case, particularly the following:

"The Court instructs the jury that all felonious homicides are presumed in law to be murder in the second degree, and, in order to elevate the offense to murder in the first degree, the burden of proof is on the Commonwealth, and, in order to reduce the offense below murder in the second degree, the burden is on the prisoner."

Furthermore, in the present case, the trial court gave all the instructions requested by the defendant, and if she had any particular theory of defense, she should have asked for an instruction in accordance therewith.

The additional sentence is not essentially a part of the definition of "malice" where there is no evidence of adequate palliation to reduce an offense from murder to manslaughter. It states a general maxim of criminal evidence applicable to the definition when palliation is relied on to rebut a presumption of malice as defined. It is, however, undoubtedly a correct statement of a rule of law, and as such has been repeatedly approved by this court, both as a part of an instruction defining "malice" and as a separate instruction.

As the trial court said, in its written opinion, it might

have been properly added to the definition given in this case had it been requested, or specific objection assigned to its omission, at the proper time. Whether its addition to the instruction as given would have been for the benefit of the defendant, with the presumption therein stated, was a question for the defendant to determine at the time the jury were instructed.

In view of the law that insulting words alone do not provide adequate provocation to reduce murder to manslaughter and the lack of evidence of legal palliation in this case, it is apparent from the instructions granted at the request of the defendant that she relied on the rule that the burden was upon the Commonwealth to prove both the essentials of the offense charged against her and its specific degree. No just cause or excuse was presented in the evidence to reduce the killing to less than murder in the second degree.

The defendant objected to the admission of the photograph of the body of the deceased on the ground that "since the Commonwealth proved and the accused conceded that Martin died from a wound inflicted by the discharge of the shotgun, the photograph was surplusage which inflamed the jury and prejudiced the accused." No authority was cited in support of the objection, nor was it argued by the defendant in her brief or before this court.

This question does not appear to have arisen in this court in a criminal case, though it has long been well settled that photographs are admissible in civil cases. See cases collected in 8 Michie's Digest of Virginia and West Virginia Reports, under the title "Photographs," page 150.

In *Staples* v. *Spence*, 179 Va. 359, 19 S. E. (2d) 69, 140 A. L. R. 527, Mr. Justice Hudgins said: "The purpose of permitting the photograph of the object to be introduced in evidence is to furnish ocular proof or pictorial communication of the condition of the object. If the condition of the object is relevant and material to the issue, such condition may be established either by verbal or photographic description, or by both."

Objects connected with crime are often offered in evidence in criminal cases when related to issues in the case. An authentic photograph shows no more than would be disclosed by a view of the object itself. It may give a more accurate description of the appearance, nature and condition of the object than a mere verbal description dependent upon memory. The picture of the wounded body of a man in the repose of death should excite no more sympathy or prejudice than the exhibition of a living person with a bruised, broken and torn body.

The manner in which Martin was shot, the distance from which he was shot, and where the shot entered his body were relevant and material to the issue.

In many of the States, photographic evidence has been held admissible in criminal cases. In Wigmore on Evidence (3rd Ed.), section 1157, this is said:

"The autoptic proference to the jury of the weapons, or tools of a crime, or of the clothing or the mutilated members of the victim of the crime, has often been objected to on the ground of Undue Prejudice. * * * But, in the majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the Courts."

In the footnote and supplement to the above section, the author lists a score of cases from thirty-eight states, many of which involve introduction of photographs in criminal cases.

A number of cases are discussed in *State* v. *Weston*, 155 Or. 556, 64 P. (2d) 536, 108 A. L. R. 1402.

The following cases, in which photographs were admitted in evidence, are close in facts and principles to the present case: *Janovich* v. *State*, 32 Ariz. 175, 256 P. 359; *Franklin* v. *State*, 69 Ga. 36, 47 Am. Rep. 748; *State* v. *Moore*, 80 Kan. 232, 102 P. 475; *State* v. *Powell*, 5 Pen. (Del.) 24, 61 A. 966.

In *State* v. *Lewis*, 139 Iowa 405, 116 N. W. 606, this is said:

" * * * It did not lie in the power of the defendant, by this general admission to prevent the state from proving all the facts, and thereby present to the jury the picture of the entire transaction relied on for conviction. Doubtless there are many cases where courts should and do preclude proof upon the admission of essential facts, but rarely where the intent or motive is involved, and may be inferred from such proof. (citations)."

In conclusion, the evidence showed that the defendant had formed an intent to kill the deceased before she obtained possession of the gun. As soon as she obtained the gun and found out how to load it, she loaded it, pointed it at the deceased, and fired, hitting him in a vital portion of the body, killing him almost instantly. Notwithstanding that, under the evidence, the jury might have found the defendant guilty of murder in the first degree, they, in the exercise of their power, found her guilty only of murder in the second degree and fixed her punishment at less than the maximum provided by the law. It cannot be doubted that they considered the circumstances in mitigation of her offense, and tempered justice with mercy.

We find no error in the judgment complained of and it is accordingly affirmed.

*Affirmed.*