COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Fulton, Ortiz and Raphael
Argued by videoconference


TIMOTHY WAYNE CARR

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0773-21-1                      JUDGE STUART A. RAPHAEL
                                                    AUGUST 23, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
L. Wayne Farmer, Judge

Andrew M. Sacks (Stanley E. Sacks; Sacks & Sacks, P.C., on
brief), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After Timothy Wayne Carr broke into the home of his estranged wife and brutally

attacked her, he was convicted of attempted capital murder, felony aggravated malicious

wounding, armed burglary, possession of burglary tools, object sexual penetration, abduction

with intent to defile, strangulation, and wounding another person in the commission of a felony.

Claiming that the evidence was insufficient, Carr challenges all but the last of his convictions.

To negate the element of malice required for attempted capital murder and aggravated malicious

wounding, Carr says he acted only in the heat of passion. But the evidence sufficed to allow the

factfinder to conclude that Carr's actions were planned and premeditated, not spontaneous or

without conscious reflection. Carr also argues that the armed-burglary and burglary-tools

convictions should be set aside because he could not break into a home that he claims he shared

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

with his wife. But the evidence showed that Carr knew that he had no right to enter her house. Finding these and Carr's other arguments without merit, we affirm.

## BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Ray v. Commonwealth*, 74 Va. App. 291, 307 (2022) (alteration in original) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021)).

Carr is Raquel Montrell Carr's second husband. Raquel was previously married to Stephen Harris, and they lived together in a house on Holbrook Arch in Suffolk. The property was titled in Harris's name. When Harris died from cancer, title passed to Raquel. After she married Carr in 2015, Carr moved into the home, but his name was never added to the deed.

Raquel's marriage to Carr deteriorated, and the couple separated in 2018, about a year before the attack at issue here. The couple anticipated divorcing. Carr was living with his mother in Virginia Beach. In the fall of 2018, because Carr still had a key to the house, Raquel changed the locks. In June 2019, Raquel asked Carr to stay away, telling him that he was "no longer welcome" there and that "the marriage was over." She blocked his calls on her cell phone and blocked him from sending her emails. On July 1—two days before the attack—Raquel installed a video-camera system for additional security.

On the night of July 3, Carr parked his automobile around the corner from Raquel's house and snuck into her backyard. He carried a digital recording device that captured an audio recording of what he did that night.

Carr walked into the shed in Raquel's backyard and removed a large pair of gardening shears, gloves, and a ladder. Using the ladder, he climbed to the second floor of the house and peered into her bathroom. He spied Raquel, wearing a bathrobe and texting on her cell phone. Claiming that he saw her texting a picture of herself to someone he didn't know, but whom he believed to be a romantic interest, Carr became enraged. But as he tried to gain entry by cutting through a window screen on the second floor, Carr fell off the ladder. He then tried to enter the house through the ground floor.

Finding all the doors locked, however, he broke through the back door, shears in hand. Carr unplugged all but one of the security cameras, disarmed the alarm, and ripped the telephone cord from the wall. He braced the back door with a chair.

Carr then confronted and attacked Raquel over the course of the next hour. Beginning in the upstairs bathroom, Carr pointed and swung the shears at Raquel and punched her in the face with his fist. The blow broke her teeth and her palette. Carr then threw Raquel on the toilet, demanding that she unlock her cell phone using its facial recognition feature. When she did not comply, Carr dragged her by the hair around her bedroom, throwing her against the wall and onto the bed. He then repeatedly jammed two fingers into her vagina.

Hoping to get away, Raquel repeatedly begged Carr for some water. When he left to get it, Raquel—now naked—frantically ran downstairs to the front door. She managed to unlock only the top latch before Carr caught her. Carr put his hands around her neck and choked her as she gasped, "I can't breathe." This part of the attack was captured on the one security camera that Carr had not disabled.

Raquel then attempted a second escape, running to the living room. But Carr caught up to her again, lifted her off the floor by her neck, and choked her. Raquel lost consciousness.

Forty-four minutes into the attack, as Raquel lay unconscious, Carr used his cell phone to call one of his daughters, admitting that he had choked and severely injured Raquel. He said he had punched her in the face and that she was throwing up blood. Carr then called his other daughter. While Carr was speaking to her, Raquel started to regain consciousness. In the background of Carr's audio recording, Raquel can be heard pleading, "I need an ambulance," "I can't breathe," and "I'm hemorrhaging." As Carr's daughter pleaded with him to get ice and start cleaning her up, Carr worried that there was "[b]lood all over the place." He repeated that he had "punched her in the face" and said that he had hit "her with something metal."

After speaking with both daughters, Carr finally called 911. He told the dispatcher that Raquel was throwing up and bleeding profusely. At times he said she was not breathing. Raquel can be heard crying out, "I'm drowning," "Help me." Carr told the dispatcher that he had caused her injuries.

When the police and emergency responders arrived, they arrested Carr and took Raquel to the hospital. Carr was charged with aggravated malicious wounding, attempted capital murder, armed burglary, possession of burglary tools, object sexual penetration, abduction with intent to defile, strangulation, wounding another in the commission of a felony, entering property with intent to damage (six counts), assault and battery on a family member, aggravated sexual battery, damaging a phone line to prevent summoning law enforcement, and unlawful filming, videotaping or photographing of another.

At trial, Detective Ireland testified about his interviews with Carr on the night of the attack. Carr admitted to attacking Raquel but denied any sexual violence. He also denied threatening to kill her. He admitted that he took the shears and used the ladder to climb up to the bathroom window, that he eventually broke through the back door, and that he confronted Raquel in the bedroom. Carr admitted that he hit her, dragged her by her hair, threw her into the

- 4 -

wall, and choked her. He further admitted to hitting her multiple times—in the mouth, face, and legs. Carr told Ireland that he had unplugged the security cameras and had propped a chair against the back door. He knew that Raquel had changed the locks on the house, and he did not have the code to access the security system.

A sexual assault nurse examiner (SANE), Jennifer Knowlton, testified as an expert about the results of her examination of Raquel on the night she was attacked. Raquel suffered physical trauma to her face, head, and body. She had scratches, redness, and blood on her arms and chest; bruising, redness, and abrasions on her legs; and abrasions, bruises, and lacerations on her hands and fingers. Although much of Raquel's face was already bandaged in gauze when Knowlton arrived, the exposed portions showed bruising and scratches, dried blood, and swelling. Raquel had also suffered puncture wounds from the shears. A twisted tooth dangled from her mouth.

Because Raquel was so severely injured and unable to open her mouth, Knowlton could conduct only a partial interview. But Raquel said that Carr had forcibly penetrated her vagina with his fingers. Knowlton did not find genital injuries but testified that the lack of genital trauma did not exclude the possibility of sexual abuse. She noted that, in most sexual-assault cases, no physical injury is visible.

Knowlton also testified to the short- and long-term impact of Raquel's injuries. The blunt-force trauma to Raquel's face required oral surgery. Knowlton also expected that Raquel would experience long-term cognitive impairments from the loss of oxygen to her brain caused by the strangulation.

At trial, Carr said that he was "totally responsible" for what he did. He admitted to parking his car near a park, entering Raquel's backyard through the gate, taking the ladder, gloves, and shears from the shed, breaking through the back door, bringing the shears into the house, hitting Raquel with a closed fist, and throwing her around the bedroom.

Carr's testimony contradicted some of his earlier statements to Detective Ireland and the statements he had made over the phone to his daughter. He testified at trial that he hit Raquel only once. He said at first that he did not recall choking her, but he then "own[ed] up to it." He said he choked her with his right hand because he had "lost it." But he denied the sexual assault.

After denying Carr's motion to strike and renewed motion to strike, the trial court convicted Carr of aggravated malicious wounding, attempted capital murder, armed burglary, possession of burglary tools, object sexual penetration, abduction with intent to defile, strangulation, and wounding another person in the commission of a felony.[1] The court found Raquel "incredibly credible" and Carr's testimony "to be incredible." After denying Carr's post-trial motions, the trial court sentenced him to 181 years' imprisonment with 155 years suspended, for an active sentence of twenty-six years.

ANALYSIS

Carr challenges the sufficiency of the evidence to support the convictions. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).

---

[1] The court acquitted Carr of the charge that he damaged a phone line to prevent summoning law enforcement, finding "some evidence" in support but not enough to prove the charge beyond a reasonable doubt. The nonconsensual-videotaping and aggravated-sexual-battery charges were dismissed after Carr moved to strike at the end of the Commonwealth's evidence. The Commonwealth's Attorney *nolle prossed* the six enter-with-intent-to-damage charges and misdemeanor family-member-assault charges.

*A. The trial court did not err in finding malice (Assignments of Error 1 & 2).*

Carr claims that he should not have been convicted of aggravated malicious wounding or attempted capital murder, both of which required proof of malice.[2] He maintains that he became enraged when he spied Raquel texting a picture of herself to someone else, losing control of his actions. He argues that he acted only in the heat of passion, negating malice. We look to homicide law to illuminate the element of malice for both convictions. *See Barrett v. Commonwealth*, 231 Va. 102, 105 (1986) ("Because the mental-state elements of unlawful wounding are the same as those of voluntary manslaughter, we will examine homicide law for a resolution of this issue.").

"Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Id.* at 106. Whether a person acted in the heat of passion or with malice is generally a question for the trier of fact to decide. *Dawkins v. Commonwealth*, 186 Va. 55, 61, 63 (1947); *Lynn v. Commonwealth*, 27 Va. App. 336, 355 (1998), *aff'd*, 257 Va. 239 (1999).

A person who acts under the "heat of passion" does so "on impulse without conscious reflection." *Meade v. Commonwealth*, 74 Va. App. 796, 814 (2022) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both." *Barrett*, 231 Va. at 106 (citations omitted). "To establish the heat of passion defense, an accused must prove he committed the crime with 'passion' and upon 'reasonable provocation.'" *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998) (quoting *Canipe v. Commonwealth*, 25 Va. App.

---

[2] *See* Code §§ 18.2-31 (aggravated murder), 18.2-51.2 (aggravated malicious wounding). While not listed as an element of aggravated murder in Code § 18.2-31, malice is "subsumed" in that statute's requirement of a "willful, deliberate, and premeditated killing." *See Winston v. Commonwealth*, 268 Va. 564, 601, 608 n.5 (2004).

629, 643 (1997)). "The provocation recognized by the law as sufficient to engender the heat of passion . . . requires something more than mere personal insult, however grievous the insult be." *McCoy v. Commonwealth*, 133 Va. 731, 739 (1922). For instance, "words alone are not sufficient to engender a reasonable provocation that incites passion and negates the presence of malice." *Smith v. Commonwealth*, 68 Va. App. 399, 412 (2018).

By contrast, malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019) (quoting *Dawkins*, 186 Va. at 61). Malice is said to "flow[] from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention." *Id.* at 256 (quoting *Martin v. Commonwealth*, 184 Va. 1009, 1015 (1946)). Malice can be express or implied. *Id.* at 256-57; *Williams v. Commonwealth*, 64 Va. App. 240, 248-49, 251-52 (2015). "Express malice is evidenced when 'one person kills [or injures] another with a sedate, deliberate mind, and formed design.'" *Watson-Scott*, 298 Va. at 256 (quoting *Pugh v. Commonwealth*, 223 Va. 663, 668 (1982)). "[I]mplied malice encapsulates 'a species of reckless behavior so willful and wanton, so heedless of foreseeable consequences, and so indifferent to the value of human life that it supplies the element of malice.'" *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 288 (1984) (Poff, J., concurring in part and dissenting in part)).

The facts support the trial court's finding that Carr's actions were done deliberately and with a sedate mind. *Id.* Carr planned to go to Raquel's house that night to see if she was "cheating" on him. He borrowed his mother's car and parked it nearby for easy access to the backyard. He planned a break-in using gloves, garden shears, and a ladder that he took from the shed. He planned to use the ladder to climb to the second floor to spy on Raquel, and he planned to use the garden shears to break through the window screen. He brought a digital device with him to record the events. Carr's actions reflected "a considered plan" that required "both thought

- 8 -

and calculation." *Meade*, 74 Va. App. at 815. The deliberate nature of his actions undermines his argument that he acted only "on impulse without conscious reflection." *Id.* at 814 (quoting *Rhodes*, 41 Va. App. at 200).

Indeed, after Carr fell off the ladder and broke into the house through the back door, he then unplugged all but one of the security cameras, disarmed the alarm, and ripped the telephone cord from the wall. He braced the back door with a chair. He then savagely attacked his estranged wife for nearly an hour.

Moments after the attack began, Carr told Raquel that he had "prayed on this s - - -." Later, as Raquel lay unconscious, he had the presence of mind to call his daughter, admitting that he had "been contemplating on this s - - - all week." He also told his daughter that he had recently made her the beneficiary on his life insurance policy.

The evidence thus supports a finding of malice based on Carr's careful "thought and calculation," *id.* at 815, and "formed design," *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). It shows that he did not act on "impulse without conscious reflection," *Meade*, 74 Va. App. at 814 (quoting *Rhodes*, 41 Va. App. at 200), thus undermining a heat-of-passion inference.

The brutality and duration of Carr's attack also supports malice. *E.g.*, *Watson-Scott*, 298 Va. at 256 (behavior "so heedless of foreseeable consequences, and so indifferent to the value of human life" (quoting *Essex*, 228 Va. at 288)); *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) ("[A]n assault with a bare fist may be attended with such circumstances of violence and brutality that [malice] may be presumed." (second alteration in original) (quoting *Fletcher v. Commonwealth*, 209 Va. 636, 640 (1969))); *Dawkins*, 186 Va. at 62-63 (considering the "violence and brutality of the attack" in its malice determination). Carr punched Raquel, broke her teeth, hit her with garden shears, dragged her by her hair, choked her, and threw her against

the walls and furniture. The attack, which lasted nearly an hour, left Raquel's blood smeared throughout the house—on walls, floors, doorknobs, and her personal belongings. Carr threatened her, "[Y]ou're going to die tonight," and said that when the police arrived he was going to "chop [her] head off."

To be sure, Carr's actions appear to have been motivated by anger, jealousy, and vengeance. But malice includes "every unlawful and [unjustified] motive," including "anger, hatred and revenge." *Watson-Scott*, 298 Va. at 256 (alteration in original) (quoting *Martin*, 184 Va. at 1015). Malice is also shown where the attack, as in this case, "was a completely unprovoked, cruel, and vicious assault, deliberately and maliciously carried out under terrifying conditions." *Shifflett v. Commonwealth*, 221 Va. 191, 195 (1980).[3]

In short, because the evidence amply supports the trial court's finding that Carr acted with malice, there is no error in the aggravated-malicious-wounding or attempted-capital-murder convictions.

### B. Carr cannot defeat the burglary charges by claiming that he broke into his own home (Assignments of Error 3 & 4).

Carr argues that he should not have been convicted of armed burglary or possession of burglary tools because he had a right to enter his own home.[4] He cites *Justus v. Commonwealth*,

---

[3] Having found the evidence sufficient to support malice, we do not reach Carr's claim that seeing his estranged wife sending a text to another person—Carr assumed it was a sexual message, something Raquel denied—constituted "reasonable provocation" to fly into a rage, beat, and strangle her. *See Smith*, 68 Va. App. at 412; *see also McCoy*, 133 Va. at 740 ("[M]ere words or gestures, however insulting or irritating they may be by reason of their abusive, contemptuous or indecent character, do not constitute adequate provocation in law for such passion or heat of blood as will reduce an intentional homicide from murder to manslaughter." (quoting 21 *Am. & Eng. Encyc.* 179)).

[4] On brief, Carr expressly disclaimed the portion of his assignment of error that claimed the evidence was insufficient to establish his intent to enter the home to commit a felony.

274 Va. 143 (2007), where the Court said that "a person may not unlawfully break and enter a home in which she has the right to occupy." *Id.* at 155 (emphasis omitted).

A person commits burglary when he "break[s] and enter[s] the *dwelling house of another* in the nighttime with intent to commit a felony." Code § 18.2-89 (emphasis added). The reference to "dwelling house" carries forth the common law protection for "a place which human beings regularly use for sleeping." *Turner v. Commonwealth*, 33 Va. App. 88, 92 (2000) (quoting *Rash v. Commonwealth*, 9 Va. App. 22, 26 (1989)). The offense remains "primarily an offense against the security of [another's] habitation." *Id.* (alteration in original) (quoting *Rash*, 9 Va. App. at 26). Thus, in *Justus*, the defendant had a viable defense to the burglary charge because she "was *living with* [her husband] in the home she was accused of having burglarized." 274 Va. at 155 (emphasis added).

Because the statute protects one's right to peaceful habitation, the fact that a defendant may have some sort of legal title in the property or license to use it does not establish his right to occupy it. In *Turner*, for instance, we upheld the husband's conviction for burglary when he broke into his estranged wife's trailer, despite that the trailer was their joint property. 33 Va. App. at 91. And in *Pooler v. Commonwealth*, 71 Va. App. 214 (2019), we held that the defendant committed burglary despite that she had a key to the residence and sometimes spent the night there at the owner's invitation. *Id.* at 222. On the night she broke in, she was not invited, and "she had no blanket permission to be there simply because [the victim] was there." *Id.* at 224.

The same is true here. Carr had no legal or proprietary interest in Raquel's home, which was titled exclusively in her name. They had been separated for a year, and Raquel had made it clear to Carr that he was not welcome there. Carr was living with his mother at the time of the attack. Raquel had changed the locks and installed a security system to protect herself. To gain

- 11 -

access, Carr first used a ladder to try to break in through a second-floor window, and when he fell off the ladder, he broke in through the back door.

In short, the trial court had ample evidence to support its conclusion that Carr had no right to occupy the home. So we find no basis to set aside his burglary convictions.

*C. The victim's testimony was not inherently incredible (Assignments of Error 5 & 6).*

"[A] conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005)). Indeed, "[b]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Id.* at 369 (alteration in original) (quoting *Wilson*, 46 Va. App. at 88).

Carr challenges his object-sexual-penetration and abduction-with-intent-to-defile convictions, asserting that Raquel was inherently incredible when she testified that he digitally penetrated her vagina. "[C]onclusions of the fact finder on issues of witness credibility may only be disturbed on appeal if we find that the witness'[s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984)).

Carr has failed to meet that high standard here. Raquel provided explicit details about the sexual assault. She had just taken a shower and was wearing only a bathrobe. After breaking into the house and grabbing her, Carr pinned her down on the bed and repeatedly forced his fingers into her vagina against her will. She recalled Carr saying as he did it, "Bitch, this is what you like. Bitch, this is what you want." Carr's audio recorder captured him saying something similar, "What, you want to cheat? Take that! Take that, bitch! Take that!" Raquel reported her sexual assault to the responding officer. The SANE examiner also testified that Raquel said

that Carr had forcibly penetrated her vagina with his fingers, as if "he was stabbing" her. Although finding no physical evidence of trauma on Raquel's genitals, the SANE examiner explained that, in most cases of sexual assault, no physical injury is visible. Raquel's account of her sexual assault cannot be said to be "so contrary to human experience" that the trial court should have found her inherently incredible. *Id.* (quoting *Fisher*, 228 Va. at 299).

To the contrary, the trial judge found Raquel very credible—stating, "I believe her 1,000 percent"—while he found Carr's denials not credible. We see no basis to disturb those credibility findings here.

### D. The evidence sufficed to prove abduction with intent to defile (Assignment of Error 6).

Carr also seeks to set aside his abduction-with-intent-to-defile conviction on the ground that the evidence failed to show an intent to defile that was "contemporaneous" with the abduction. The Commonwealth notes that Carr cites no legal authority for his contemporaneity argument and asks that we deem this claim defaulted. *See* Rule 5A:20(e) (requiring, for "each assignment of error, the standard of review and the argument—including principles of law and the authorities"); *Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) ("As we have often said, 'Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue.'" (quoting *Andrews v. Commonwealth*, 280 Va. 231, 252 (2010))).

Assuming for argument's sake that the assignment of error is not defaulted, we find it to be meritless. A defendant commits the crime of abduction if he, "by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty." Code § 18.2-47(A). The crime of abduction with intent to defile under Code § 18.2-48 "incorporates" those elements and adds the "specific intent" element of abduction "with intent to defile." *Crawford v. Commonwealth*, 281 Va. 84, 102-03 (2011). "In order to prove the greater offense

of abduction with intent to defile, the evidence must show that [Carr] abducted [Raquel] with the intent to sexually molest her." *Id.* at 103.

The evidence sufficed to meet that standard. Raquel testified that Carr dragged her around her home by her hair, "controlled" her, and "made [her] go where he wanted." He then threw her on the bed and jammed his fingers into her vagina against her will. She consistently told police officers and the SANE examiner that he did so without her consent. The elements of the offense were thus established.

*E. The evidence supported the strangulation conviction (Assignment of Error 7).*

A person commits strangulation when he, "without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person." Code § 18.2-51.6. In his final assignment of error, Carr argues that he did not knowingly or intentionally apply pressure to Raquel's neck.

But the evidence shows that he did just that. Raquel testified that Carr choked her multiple times, eventually causing her to lose consciousness. Raquel can be heard on Carr's audio recorder begging, "Please let go so I can breathe. Please let go." The recorder also documented Carr's telling his daughter, "I choked her out." Carr also admitted to choking Raquel when he confessed to Detective Ireland at the hospital. At trial, Carr said, "I own up to choking her." The front-door security camera also shows Carr catching Raquel in the foyer as she tried to escape, placing his hands around her neck, and choking her as he held her naked body against the wall.

Carr does not dispute that Raquel's injuries from the strangulation were extensive. Indeed, the SANE examiner testified that Raquel's strangulation injuries included a raspy voice, redness on her face and neck, swollen lips, difficulty swallowing, and trouble opening her eyes,

as well as future cognitive impairment expected to result from the loss of oxygen to Raquel's brain.  So there was more than enough evidence to support the strangulation conviction.

CONCLUSION

Because none of Carr's arguments has merit, we see no basis to set aside any of his convictions.

*Affirmed.*