COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Beales and Alston
Argued at Richmond, Virginia

**PUBLISHED**

LAURENCE MARIA SMITH, S/K/A
 LAURENCE MARIE SMITH

v.        Record No. 1058-16-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
JANUARY 16, 2018

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Sarah L. Deneke, Judge

Ronald Hur, Senior Assistant Public Defender (Amr A. Ahmed,
Assistant Public Defender, on brief), for appellant.

Victoria L. Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

On June 15, 2015, the grand jury of Spotsylvania County indicted Laurence Maria Smith

("appellant") for first-degree murder in violation of Code § 18.2-32 for the murder of her

husband, Sean Smith ("victim").  On December 17, 2015, following a four-day trial, a jury

convicted appellant of voluntary manslaughter.

Appellant raises four assignments of error on appeal to this Court.  First, appellant claims

the trial court erred by convicting her of voluntary manslaughter "as the evidence was

insufficient to prove appellant intentionally killed Sean Smith and that appellant acted in the

'heat of passion' and 'upon reasonable provocation.'"  Second, appellant claims the trial court

erred by denying her motion for a mistrial and her motion to set aside the verdict because

appellant was not competent throughout the trial.  Third, appellant claims the trial court erred by

denying appellant's motion for a mistrial and her motion to set aside the verdict because

"Appellant's PTSD [Post-Traumatic Stress Disorder] flashback prevented her from meaningfully

exercising her right to be present at trial and to testify in her own defense and appellant did not make a valid waiver of those rights." Finally, appellant assigns error to the trial court's denial of her motion "to pause and continue the trial to allow her to receive mental health treatment before waiving her right to be present at trial and to testify in her own defense."

For the reasons that follow, we affirm appellant's conviction of voluntary manslaughter.

## I. BACKGROUND

Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court, Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), the evidence in this case established that on March 16, 2015, police responded to a 911 call at appellant's residence. Officer Tavarez, the first officer on the scene, was admitted to the residence by one of appellant's daughters. Once inside, Officer Tavarez encountered appellant whose hands were covered in blood. Officer Tavarez also heard appellant say, "It's my fault. I shouldn't have been playing with it." On the second floor of the residence, Officer Tavarez found the victim facedown and bleeding profusely from a gunshot wound to the head. Officer Tavarez called for the assistance of paramedics; however, the victim died despite the efforts to save his life.

Officer Handy, the second officer on the scene, encountered appellant and her two daughters in front of the residence. Officer Handy also observed that appellant's hands were covered in blood. Officer Handy testified that appellant admitted to shooting the victim. He also testified that appellant said that she attempted to unload her handgun, and she believed it was empty when she pulled the trigger.

At trial, the evidence showed that appellant and the victim had an argument while removing multiple guns from an upstairs gun safe to prepare for an upcoming renovation. The couple placed the guns on a bed, and the victim directed appellant to go downstairs and get her

"peashooter," referring to appellant's handgun. According to appellant, the victim told her, "Don't forget to uncock it and don't fuck around." He also said, "[Y]ou think you know how to handle guns but you don't." Appellant went downstairs, as she was directed, and retrieved her handgun. Appellant told police that while she was downstairs she "popped out the magazine," racked the slide back, and saw a bullet eject from the gun. Next, appellant removed the magazine from the handgun, and she returned to the upstairs room where the victim was laying out the guns. Appellant told police that she believed the gun was empty, and to show the victim that she had properly unloaded it, appellant raised the gun and pulled the trigger – shooting the victim. Appellant initially told police that she pulled the trigger without aiming. However, she later admitted that she aimed the gun towards the room's window, close to where the victim was standing.

After shooting the victim, appellant told police that she dropped the gun and rushed to help the victim, and in doing so, appellant got the victim's blood on her hands. Next, appellant said she picked up the gun because the children were nearby, and she took the gun downstairs, where she called 911.

Police recovered appellant's .380 caliber Smith and Wesson from the downstairs bedroom. During the investigation, the weapon was examined by the Department of Forensic Science, and, contrary to appellant's statements, the analysis of the gun showed no traces of the victim's blood on the gun.

During appellant's interview with police, appellant said that she and the victim had not argued that evening. Appellant told police, "[W]e were fussing, but not arguing." However, police interviews with the couple's two young daughters revealed that the girls heard "fighting" and "yelling" before the shooting. After being confronted with this inconsistency, appellant admitted that the couple "was arguing about 20 minutes before all of this went down." Appellant

also admitted that the argument upset her; however, she said she was no longer angry when she pulled the trigger.

In her interview with police, the eldest daughter, who was nine years old, said that appellant told her that appellant accidentally pulled the trigger while cleaning the gun; however, in an unsolicited statement, the eldest daughter said she was unsure if that was true. The child also told police that she had never seen appellant clean the gun.

Detective Lunsford testified at trial about the functioning of a firearm like the appellant's .380 Smith and Wesson. Detective Lunsford testified that the gun was a "double action only" handgun, meaning that it required more force to pull the trigger than would be required to pull the trigger on a single action handgun. Also, because appellant's weapon was "double action only," it required the same amount of force every time the trigger was pulled. The Commonwealth also presented evidence that appellant had completed a pistol safety course to obtain her concealed carry permit. Finally, during her interviews with police, appellant was able to recall and discuss basic safety rules for handling firearms.

## A. The Trial

During the Commonwealth's case in chief, appellant became visibly upset on three separate occasions – two of which resulted in appellant waiving her right to be present during the presentation of the Commonwealth's evidence.

First, during the Commonwealth's playing of the video of appellant's interview with police, defense counsel informed the court that appellant needed to take a break. In response, the court took a thirty-minute recess so appellant could compose herself. Before resuming the video, the court spoke with appellant and her counsel about what was upsetting her. Appellant acknowledged that watching the video was upsetting, and the court asked if appellant wanted to continue watching it. Appellant responded, "No, please. Please no." Appellant had discussed

with her attorneys the possibility of not being present in the courtroom while the video played, and appellant believed that her absence during it would not hurt her ability to discuss the case with her attorneys. Given the prospect of appellant choosing to absent herself from the trial, the court explained that appellant had a significant constitutional right to be present during every portion of the trial. Only appellant could choose to waive that right.[1] The court then took an early lunch recess to enable appellant to further discuss the matter with her attorney.

---

[1] The court informed appellant of the following:

> THE COURT: Okay. Ms. Smith, here is what your attorneys are asking me to do because you know that you have an absolute right to be present in this courtroom during every word that is taking place in this trial. You understand that?
>
> DEFENDANT SMITH: Yes. Yes, I do.
>
> THE COURT: And no one can make you leave this courtroom, and no one can continue on with this trial without you present.
>
> DEFENDANT SMITH: Okay.
>
> THE COURT: Unless you want me to. You understand that?
>
> DEFENDANT SMITH: Yes, I do.
>
> THE COURT: Because it's your right to be present during every part of this proceeding. You can also waive or give up that right for all or a part of the proceedings.
>
> DEFENDANT SMITH: Okay.
>
> THE COURT: I mean, if what you decide after talking in private with your attorneys is that you do not want to be present during certain portions of this, for instance, the video, you have that right, you can make that decision and you would not be in the courtroom if that's what you tell me you want to do during the continuation of the videos, and then you can come back into the courtroom at any time. I mean, if you just want to be out for that part and come back you can do that. You understand?
>
> DEFENDANT SMITH: Yes, ma'am.

- 5 -

The second occurrence of appellant becoming visibly upset occurred after the lunch recess when the Commonwealth resumed showing the same video. After the jury was removed, appellant told the court, "I waive those rights to be here when you play those videos. I can't." The court took another recess to enable defense counsel to confer with appellant and to enable appellant to calm down. After the recess, defense counsel informed the court that he was very concerned and that appellant had been diagnosed as having "very severe PTSD-- as a result of what happened here." Defense counsel said, "It appears to me that Ms. Smith is being taken back to the moment of what was going on there and she was distraught, she was completely overwhelmed asking to stop the trial for the day." Defense counsel made a motion "to pause for today" so appellant could speak with a mental health doctor whom she had previously seen. That doctor was a witness scheduled to testify on the following day.

The court asked appellant if she was experiencing any physical pain, and appellant responded that she had a headache and was experiencing chest pains. Appellant said, "I'm physically reliving everything right now." However, appellant said that the trial could proceed if she did not need to be present for the video. Appellant acknowledged that she understood that

THE COURT: But it's a significant right and so I want you to think seriously about it, Ms. Smith, because I know it's difficult for you to be here, but it's also important that you're able to see and to hear the evidence that's being presented against you. You have attorneys who can do that for you and can help you, but it's a significant and a Constitutional Right that you're giving up to be present during all portions of the trial. So what I'm going to do right now is I'm going to bring the jury out for just a minute, I think I'm going to go ahead and send them to lunch now, we're just going to take an early lunch so that you have an opportunity in privacy, relative privacy, to, number one, compose yourself and, number two, talk to your attorneys at length about whether you want to be in the courtroom when we come back and when we proceed. All right. Because it's not a decision you should make hastily. All right. You following me, Ms. Smith?

DEFENDANT SMITH: Yes, ma'am.

- 6 -

she would not have another opportunity to view the video. Appellant also said that she was not having any problem communicating with her attorneys and had no questions about their abilities to continue in her absence. Based on appellant's statements, the court found that she waived her right to be present for the playing of the video and that she understood she could return to the courtroom at any point. Over defense counsel's objection, the court made the following finding:

> I am making a finding based on the observations here today that Ms. Smith is, first of all, competent and, secondly, that she understands her rights, she understands the significance of those rights, she understands how to exercise those rights and that she has made a voluntary and an intelligent decision to waive her right to be present in the courtroom during a certain portion of this trial. So I certainly understand the objection, it's noted for the record, but I've made that finding.

This was the first point at which appellant was absent during the presentation of the Commonwealth's evidence.

The third time appellant became visibly upset was during Detective Lunsford's testimony and demonstration of the functioning of a handgun. Appellant informed the court that she was upset by the sound of the gun, and she requested to absent herself during the remainder of the demonstration. Defense counsel expressed concern that appellant was not rationally capable of waiving her right to be present. However, the court found that appellant, while upset, was rational, intelligent, and capable of making a decision as to whether she wanted to remain in the courtroom.[2] Thereafter, appellant left the courtroom for the remainder of the demonstration.

---

[2] The court stated, "What I have done in each one of these circumstances is given Ms. Smith some time by herself essentially to gather herself, and then time to speak to her attorneys. I understand that you feel it may not be enough time, but I am convinced that even when upset as Ms. Smith is now, I mean, she's crying, she's upset, but she is rational, she's intelligent, she's rational, she is capable not of predicting what it is that is going to upset her but in recognizing what it is that upsets her and in making decisions." The court went on to make the following finding, "And so, Mr. Johnson, your concerns are legitimate and I understand them, but I think Ms. Smith is, and I'm finding that Ms. Smith is capable of making an intelligent and a voluntary decision as to when she chooses to be present and not."

At the conclusion of the Commonwealth's case, defense counsel made a motion to strike, which the court denied.  During her case in chief, appellant opted not to testify, and defense counsel made a renewed motion to strike, which the trial court again denied.

### B.  Jury Instructions and Post-Trial Matters

When the evidentiary portion of the trial concluded, the court issued jury instructions that were jointly drafted and agreed to by counsel.  The court instructed the jury on the elements of first-degree murder as well as the lesser homicide offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter.  The language of this instruction on murder and voluntary manslaughter mirrored Virginia's Criminal Model Jury Instruction G33.700, "Lesser Included Offenses."

Instruction 6 to the jury states:

> Mrs. Smith is charged with the crime of first degree murder.  The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That Ms. Smith killed Sean Smith; and
> (2) That the killing was done with malice; and
> (3) That the killing was willful deliberate and premeditated.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find Mrs. Smith guilty of first degree murder but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the first two elements of the offense as charged but you do not find beyond a reasonable doubt that the killing was willful, deliberate and premeditated, then you shall find Mrs. Smith guilty of second degree murder but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.
>
> If you find that the Commonwealth has failed to prove beyond a reasonable doubt that the killing was malicious but that the Commonwealth has proved beyond a reasonable doubt that Mrs. Smith killed Sean Smith and further:

(1) That the killing was the result of an intentional act; and
(2) That the killing was committed while in the sudden heat of passion upon reasonable provocation;

then you shall find Mrs. Smith guilty of voluntary manslaughter but you shall not fix the punishment until the verdict has been returned and further evidence has been heard by you.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt the elements of voluntary manslaughter, but you find that the Commonwealth has proven beyond a reasonable doubt that:

(1) That Mrs. Smith killed Sean Smith; and
(2) That the killing, although unintended, was the direct result of negligence so gross, wanton and culpable as to show a callous disregard of human life;

then you shall find Mrs. Smith guilty of involuntary manslaughter but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of involuntary manslaughter, then you shall find Mrs. Smith not guilty. If you find that the Commonwealth has failed to prove beyond a reasonable doubt any of the above offenses, then you shall find the defendant not guilty.

No jury instruction was given regarding the type of actions or conduct that can legally give rise to a "reasonable provocation" that can negate malice – or that is insufficient to be such a reasonable provocation.

After the case was submitted to the jury, defense counsel made a motion for a mistrial. Defense counsel argued that appellant was not "able to make a voluntary rational decision free of her rationality being overborne by emotion," and, "that it would deprive her of her due process rights to continue with this trial because she was deprived of her right to testify." Therefore, defense counsel argued that appellant was not capable of making a voluntary, rational decision regarding her right to testify. Defense counsel also argued that appellant was intermittently incompetent during the trial based upon her PTSD. The trial court denied defense counsel's

motion and found that, while the subject matter of the trial was upsetting for everyone involved, appellant was able to effectively communicate with the court and her counsel throughout the trial. Furthermore, the court found that appellant was capable of making her own decision at trial concerning the right to be present and her right to testify. Finally, the court also found that no person associated with the government had infringed on the appellant's rights and prevented her from testifying.

The jury convicted appellant of voluntary manslaughter, the trial court rejected defense counsel's motion to set aside the verdict, and this appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence on Appellant's Voluntary Manslaughter Conviction

On brief, appellant challenges the sufficiency of the evidence to support her conviction of voluntary manslaughter. She argues that the evidence is insufficient because she believed the gun was unloaded at the time she fired it; therefore, the killing was not intentional. She also argues that the Commonwealth failed to prove voluntary manslaughter because words alone are insufficient to give rise to a "reasonable provocation." Appellant contends that the evidence, at most, supported a conviction of involuntary manslaughter.

In order to properly assess appellant's argument, it is necessary to review the law in Virginia on the crime of voluntary manslaughter. Code § 18.2-35 classifies voluntary manslaughter as a Class 5 felony; however, the statute does not define the offense. Accordingly, because the General Assembly has not statutorily defined the offense of voluntary manslaughter, we must look to the common law. See Code § 1-200 ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.").

In 1769, in his Commentaries on the Laws of England, Sir William Blackstone defined the offense of manslaughter as follows: "Manslaughter is therefore thus defined, the unlawful killing of another, without malice either express or implied: *which may be either voluntarily, upon a sudden heat*; or involuntarily, but in the commission of some unlawful act." 4 William Blackstone, Commentaries on the Laws of England *190-91 (1769) [hereafter "Blackstone"] (emphasis added). The Supreme Court of Virginia adopted this definition in M'Whirt's Case, 44 Va. (3 Gratt.) 594, 605 (1846). Almost fifty years later, in Byrd v. Commonwealth, 89 Va. 536, 538, 16 S.E. 727, 728 (1893) (citing 4 Blackstone *190), the Supreme Court continued to rely on Blackstone's definition of voluntary manslaughter as arising "from the sudden heat of the passions."

Blackstone also commented on the difference between murder and manslaughter. He explained:

> [W]e may take it for a general rule, that all homicide is malicious, and of course amounts to murder, unless where [1] justified by the command or permission of the law; [2] excused on the account of accident or self-preservation; [3] *or alleviated into manslaughter, by being either the involuntary consequence of some act, not strictly lawful, or (if voluntary) occasioned by some sudden and sufficiently violent provocation.*

4 Blackstone *201 (emphasis added). The Supreme Court also recognized this distinction in M'Whirt's Case, stating, "The difference between the crimes of murder and manslaughter, consists in this, that manslaughter, (where voluntary,) arises from the sudden heat of the passions, murder from the wickedness of the heart. Malice aforethought is the grand criterion which distinguishes murder from other killings." M'Whirt's, 44 Va. (3 Gratt.) at 605 (citing 4 Blackstone *198).

Both of Virginia's appellate courts have also continued to use this language when discussing voluntary manslaughter in more recent cases. See Jenkins v. Commonwealth, 244

Va. 445, 457, 423 S.E.2d 360, 368 (1992) ("To reduce homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation." (quoting Barrett v. Commonwealth, 231 Va. 102, 105-06, 341 S.E.2d 190, 192 (1986))); Rhodes v. Commonwealth, 41 Va. App. 195, 200, 583 S.E.2d 773, 775 (2003) ("A killing done in the heat of passion and upon reasonable provocation will reduce a homicide from murder to voluntary manslaughter.").

The Commonwealth also continues to follow the common law principle that words alone are not sufficient to engender a reasonable provocation that incites passion and negates the presence of malice. See, e.g., Martin v. Commonwealth, 184 Va. 1009, 1016-17, 37 S.E.2d 43, 46 (1946) ("It has long been the settled rule in Virginia that words alone, however grievous or insulting, cannot justify taking human life with a deadly weapon . . . ."); McCoy v. Commonwealth, 133 Va. 731, 740, 112 S.E. 704, 707 (1922) ("[M]ere words or gestures, however insulting or irritating they may be by reason of their abusive, contemptuous or indecent character, do not constitute adequate provocation in law for such passion or heat of blood as will reduce an intentional homicide from murder to manslaughter."); Rhodes, 41 Va. App. at 201, 583 S.E.2d at 776 ("Words alone, no matter how insulting, are never sufficient to constitute heat of passion.").

Appellant argues that her conviction must be reversed, contending that Virginia case law defines voluntary manslaughter as a homicide committed in the heat of passion upon reasonable provocation (and requiring more than words to constitute sufficient provocation).[3] Appellant argues this because she claims that heat of sudden passion is an element of the offense of voluntary manslaughter that must be established by the Commonwealth beyond a reasonable

_____

[3] The jurors were not instructed that "words alone" cannot give rise to such a reasonable provocation. However, as explained above, settled Virginia case law supports the common law principle that words alone would not be enough for reasonable provocation.

- 12 -

doubt and that, here, the Commonwealth failed to prove that "element." Given the requirement that we should decide cases on the best and narrowest grounds, see Commonwealth v. White, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) (recognizing that "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'" (quoting Commonwealth v. Swann, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015))), we need not decide in this case whether heat of passion upon reasonable provocation is an element of voluntary manslaughter because the jurors in this case were instructed that, in order to find appellant guilty of voluntary manslaughter, the Commonwealth must prove "[t]hat the killing was committed while in the sudden heat of passion upon reasonable provocation." As stated *supra*, there was no objection by appellant's counsel to the jury instructions at trial, nor did appellant assign error to that instruction on appeal. In fact, the jury instructions were submitted to the trial court by the agreement of counsel of both parties. As a result, neither the accuracy of the jury instructions nor the propriety of their submission to the jury is now before us on appeal. Knight v. Commonwealth, 18 Va. App. 207, 216, 443 S.E.2d 165, 170 (1994) (["O]ur consideration of these issues on appeal is barred because appellant failed to object properly at trial."). See Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989) ("It is well settled that instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review."); see also Wagoner v. Commonwealth, 289 Va. 476, 485 n.2, 770 S.E.2d 479, 484 n.2 (2015) (noting that where neither party objected to the jury instruction defining proximate cause, that "definition of proximate cause is the law of the case, binding on the parties as well as this Court"); Wintergreen Partners, Inc. v. McGuirewoods, LLP, 280 Va. 374, 379, 698 S.E.2d 913, 916 (2010) ("Because Wintergreen neither objected nor assigned error to the instructions or the verdict form [regarding respondeat superior and premises liability], they became the law of the case."). Consequently,

the model jury instruction, which appears to have been modeled from Virginia Supreme Court case law, required the Commonwealth to prove beyond a reasonable doubt "(1) [t]hat the killing was the result of an intentional act; and (2) [t]hat the killing was committed while in the sudden heat of passion upon reasonable provocation."[4]

*Assuming without deciding* that reasonable provocation is an element of voluntary manslaughter *in this case, given the jury instruction here*, we do not need to actually decide whether the evidence was sufficient for voluntary manslaughter because of the rule expressed by the Supreme Court in Blankenship v. Commonwealth, 193 Va. 587, 70 S.E.2d 335 (1952), and in Connell v. Commonwealth, 144 Va. 553, 131 S.E. 196 (1926); see Taylor v. Commonwealth, 186 Va. 587, 590, 43 S.E.2d 906, 908 (1947) ("For nearly fifty years the rule so declared has been followed consistently."); see also Puckett v. Commonwealth, 182 Va. 237, 28 S.E.2d 619 (1944); Fleming v. Commonwealth, 170 Va. 636, 196 S.E. 696 (1938); Maxwell v. Commonwealth, 165 Va. 860, 183 S.E. 452 (1936); Tucker v. Commonwealth, 159 Va. 1038, 167 S.E. 253 (1933); Burton & Conquest v. Commonwealth, 108 Va. 892, 62 S.E. 376 (1908).

---

[4] The concurrence offers intriguing points and thoughtful comments on the crime of voluntary manslaughter and on the rather unique nature of this case on appeal. As the concurrence explains, there is some support for viewing heat of passion as a mitigating circumstance, often argued by the defendant, rather than as an element that the Commonwealth must prove beyond a reasonable doubt – as the jury instructions in this case provide and as the Virginia Supreme Court case law seems to dictate. See McCoy, 133 Va. at 738, 112 S.E. at 707 ("The court, therefore, very properly told the jury by Commonwealth's instruction 4 . . . 'that manslaughter is the intentional killing of one person by another upon sudden heat and upon reasonable provocation without malice.'"); Byrd, 89 Va. at 538, 16 S.E. at 728 ("[M]anslaughter, when voluntary, arises from the sudden heat of the passions . . . ."). In this unusual case, appellant never argued to the trial court or to the jury that appellant's indictment for murder should be reduced to voluntary manslaughter because the killing occurred in the heat of passion upon reasonable provocation. However, we need not resolve these potential discrepancies because in this case, we are bound by the jury instructions and because we must follow the precedent set by the Supreme Court of Virginia in Blankenship v. Commonwealth, 193 Va. 587, 70 S.E.2d 335 (1952), and its predecessors, including Connell v. Commonwealth, 144 Va. 553, 131 S.E. 196 (1926).

In Blankenship, the Supreme Court explained:

> [T]he rule supported by the weight of authority seems to be that if the evidence demands or warrants a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal or, if there is, it is not sufficient to warrant or require acquittal, or is disbelieved by the jury, the defendant is not entitled to a reversal or a new trial on the ground that the court instructed on the lower degree of homicide, as to which there was no evidence, the theory being that he is not prejudiced thereby and cannot complain.

Blankenship, 193 Va. at 593, 70 S.E.2d at 338.

In Blankenship, a wife was charged with first-degree murder for shooting her husband as he slept. Wife initially lied to the police, telling them an unidentified intruder shot her husband. Id. at 588, 70 S.E.2d at 335. Wife subsequently changed her story and admitted to waking in the morning to find her husband shot with the pistol lying near her hand. Id. at 588-89, 70 S.E.2d at 336. She claimed to have no recollection of shooting her husband. Id. at 589, 70 S.E.2d at 336. Testimony from numerous witnesses supported the fact that husband and wife were a loving couple and that wife had a reputation in the community for being truthful. Id. At the close of the evidence, the jury was instructed on the lesser homicide offenses, including involuntary manslaughter. Id. at 590, 70 S.E.2d at 336. Subsequently, the jury convicted wife of involuntary manslaughter. Id. at 588, 70 S.E.2d at 335. On appeal, wife challenged the trial court's instructing the jurors on the lesser homicide offenses, and claimed that the evidence was insufficient to find her guilty of any offense. Id. at 590, 70 S.E.2d at 336. There was no evidence in Blankenship to support the jury's finding of involuntary manslaughter. Id. at 591-92, 70 S.E.2d at 337. In upholding the conviction, the Supreme Court stated as follows:

> [T]he verdict of a jury finding an accused guilty of a lesser degree of homicide would not be disturbed, even though the evidence adduced tended to prove murder in the first degree and none other. . . . [U]nless this practical application of the principles of law [is] upheld, "owing to the tenderness of juries and their reluctance to impose the highest penalty, many crimes would go wholly

- 15 -

> unpunished, and thus the rigor of the law would tend rather to the promotion than to the prevention of crime."

Id. at 592, 70 S.E.2d at 337-38 (quoting Burton & Conquest, 108 Va. at 900, 62 S.E. at 379).

Given the standard of review we must apply in sufficiency cases and the rule in Blankenship (and the line of Supreme Court cases that are its predecessors), the appropriate line of analysis is not only whether any rational factfinder could have found the evidence sufficient for voluntary manslaughter but also whether any rational factfinder could have found the evidence sufficient for second-degree murder. See Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) ("We must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)); Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) ("The issue upon appellate review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979))). As with all sufficiency questions on appeal, we undertake this analysis without engaging in impermissible appellate fact-finding. See Perry v. Commonwealth, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010).

Here the record shows that appellant freely admitted to responding police officers that she shot and killed the victim. The record also shows that appellant intentionally raised the gun, pointed it in the victim's direction, and pulled the trigger. Appellant admitted in her statements to police that she and the victim had been arguing, as both her daughters also told the police – and that the argument had upset her – although she claimed that she was no longer angry when she pulled the trigger. In addition, the Commonwealth established (and appellant does not dispute) that appellant had completed a training course on pistol safety and knew the safety

rules for handling a firearm. Furthermore, "malice may be inferred 'from the deliberate use of a deadly weapon.'" See Knight v. Commonwealth, 61 Va. App. 148, 156, 733 S.E.2d 701, 705 (2012) (internal quotes and citations omitted). Therefore, applying the Supreme Court's rule in Blankenship, based on the permissible inferences that a rational factfinder could draw from the evidence in the record, we cannot conclude that no rational factfinder could have found appellant guilty of second-degree murder. As in Blankenship, appellant was not prejudiced by the jury's reluctance to convict her of murder. Therefore, appellant is not entitled to a reversal of her voluntary manslaughter conviction or a new trial.

The concurrence disagrees with the necessity of our applying the rule in Blankenship and its predecessors.[5] However, an analysis of Connell illustrates the need for us to utilize the rule in Blankenship. In Connell, the appellant was convicted of voluntary manslaughter. 144 Va. at 554, 131 S.E. at 197. The Commonwealth's evidence established that Garnett Connell killed the victim when they were working for a lumber company. Id. Connell approached the victim, and when he was approximately sixteen feet away, he picked up an axe, which was lying on the ground. Id. at 555, 131 S.E. at 197. Connell continued to approach, and when he

---

[5] The concurrence claims our reliance on Blankenship is unnecessary, and states that Blankenship is "likely no longer valid precedent." The concurrence arrives at this conclusion in part based on its argument that the analysis in Blankenship is dependent upon a burden-shifting presumption that was deemed unconstitutional in Mullaney v. Wilbur, 421 U.S. 684 (1975). However, in Hodge v. Commonwealth, 217 Va. 338, 228 S.E.2d 692 (1976), the Supreme Court of Virginia considered the constitutionality of the law dealing with presumption in light of the United States Supreme Court's decision in Mullaney, and found that Virginia's law simply did not violate Mullaney. The Supreme Court in Hodge stated that what had been referred to as a "presumption" in Virginia was actually only a permissible inference. The Supreme Court concluded, "We believe that the presumption of second degree murder employed in Virginia is the type [of] procedural device permitted by Mullaney." Id. at 342, 228 S.E.2d at 695.

Recognizing that the presumption of second-degree murder is actually an inference rather than a presumption, the rule in Blankenship would still apply to this case. Furthermore, as the Supreme Court has not overturned Blankenship and its predecessor decisions in that long line of cases, we continue to be bound by the Supreme Court's decisions in these cases.

was close enough, he struck the deceased twice with the head of the axe and the third time with its blade, burying it in his skull. Id.

Claiming self-defense, Connell testified that, as he approached the victim, the victim threatened to kill him while running his hand to his hip pocket and bringing it out again while approaching Connell. Id. Connell claimed that it was only then that he struck the victim with the axe. Id. Connell also testified that, at the time he hit the victim, he could see something in the victim's hand, and the victim had previously told him that the victim carried a razor and a pistol with him. Id.

After reviewing the evidence, the Court stated, "By their [the jury's] verdict they rejected the defense of the accused, but, somewhat illogically, found him guilty of voluntary manslaughter, instead of murder." Id. at 556, 131 S.E. at 197. On appeal, Connell argued that the evidence justified either a conviction of murder, or an acquittal based on self-defense. Instead of upholding Connell's conviction for voluntary manslaughter because the evidence was sufficient to show the intentional killing of another (but without malice), assuming that those elements are all that is necessary for a voluntary manslaughter conviction, the Supreme Court held that the evidence was sufficient for murder, and "one convicted of a crime, sufficiently charged but less in degree than the evidence justifies, cannot complain of such an error in his own favor." Id. at 557, 131 S.E. at 197 (citing State v. Lindsey, 5 P. 822 (Nev. 1885)). In this case, we are presented with the same options as the Supreme Court was in Connell, and we are bound by that precedent. Therefore, for all the reasons noted, we must apply the rule in Blankenship and Connell, and affirm appellant's conviction by recognizing that appellant is not prejudiced by the jury's decision to find her guilty of voluntary manslaughter.

B.  The Denial of Appellant's Motion for a Mistrial and Motion to Set Aside the Verdict

We choose to address together appellant's second and third assignments of error because both deal with the question of appellant's competency during the trial, and whether she voluntarily and intelligently waived her right to be present during certain portions of the trial and her right to testify.

"The determination whether a criminal defendant is competent to stand trial is a question of fact that will not be disturbed on appeal unless plainly wrong." Orndorff v. Commonwealth, 271 Va. 486, 500, 628 S.E.2d 344, 351 (2006).  "In conducting our review, we consider the evidence in the light most favorable to the Commonwealth, the prevailing party on this issue in the circuit court." Id. at 500, 628 S.E.2d at 352.

Here, viewing the evidence in that light, as we must on appeal, the record is clear that appellant was upset on numerous occasions at trial by the Commonwealth's evidence.  On two such occasions, the appellant freely chose to remove herself from the courtroom.  Before allowing the appellant to temporarily leave the courtroom during the trial, the trial court went to great lengths to ensure that appellant understood that she was giving up a significant constitutional right.  Also, the trial court explained that the matter could only proceed without her if appellant freely chose to be absent.  The court also explained that appellant could return to the courtroom at any time.

The trial judge had the ability to observe and speak with appellant during the trial.  Also, on two separate occasions the trial judge found that appellant was competent, fully understood her rights, and was able to communicate with the court and her counsel, and ultimately that appellant chose to waive both her right to be present for the presentation of certain evidence – and her right to testify.  Accordingly, we affirm the trial court's decisions as the evidence showed that the trial court went to significant lengths to give appellant breaks to compose herself

- 19 -

– and went to considerable effort to make sure appellant understood what rights she was waiving – and to make sure that she could communicate intelligently with her counsel and the court. We hold that the trial court's conclusion and decision were not plainly wrong.

### C. Appellant's Motion to Pause the Trial

"A motion for a continuance . . . is addressed to the sound discretion of the trial court whose decision will not be reversed unless the record affirmatively shows an abuse of such discretion." Smith v. Commonwealth, 16 Va. App. 630, 634, 432 S.E.2d 2, 5 (1993) (quoting Shifflett v. Commonwealth, 218 Va. 25, 30, 235 S.E.2d 316, 319 (1977)).

Appellant claims that the trial court erred by denying her motion to pause the hearing until the following day to enable her to seek mental health treatment. Appellant argues that the trial court's denial of the motion subjected the appellant to a trial that she lacked the requisite competency to understand. As discussed *supra*, the trial court went to great lengths to ensure that appellant understood her rights. Appellant chose to waive her rights and was found to be competent by the trial court on two separate occasions. Given the record before us, we cannot say that the trial court abused its discretion by denying appellant's motion.

### III. CONCLUSION

Here, appellant was convicted of voluntary manslaughter, a lesser homicide than murder. Because the jury was instructed that in order to convict appellant of voluntary manslaughter, the Commonwealth must prove "[t]hat the killing was committed while in the sudden heat of passion upon reasonable provocation," we are bound by that instruction on appeal. While appellant claims that she is entitled to a reversal of her conviction and a new trial on involuntary manslaughter because the Commonwealth failed to prove this "element," the longstanding rule stated by the Supreme Court in Blankenship, in Connell, and in a long line of cases holds otherwise. Here, we cannot say that no rational factfinder could find the evidence sufficient to

conclude that the elements necessary for a higher level of homicide – second-degree murder – were present.  Therefore, we cannot say the jury did not simply decide to show mercy or that appellant has been prejudiced by being convicted of the lesser homicide offense of voluntary manslaughter.

Looking to appellant's other assignments of error, we note that the trial court went to great lengths to ensure that appellant was aware of her significant constitutional right to be present at trial and her right to testify in her own defense.  After being repeatedly reminded of her rights (and given breaks to compose herself), appellant freely decided to temporarily leave the courtroom during the presentation of some evidence that upset her – and not to testify at trial.  The trial court went to great lengths to give appellant additional time to compose herself and to communicate in relative privacy with her counsel at numerous points in the trial prior to appellant's freely choosing to temporarily leave the courtroom.  Therefore, we find that the trial court also did not abuse its discretion by denying appellant's motion to continue the trial to another day.

For all of these reasons, we affirm appellant's conviction for voluntary manslaughter.

<u>Affirmed.</u>

Humphreys, J., concurring in the judgment.

I join my colleagues in affirming the judgment in this case. I also join in Parts B and C of the majority's analysis with respect to appellant's latter three assignments of error regarding the circuit court's denial of her motions for a mistrial and to set aside the verdict because of her alleged sporadic incompetency during her trial; the denial of her motions for a mistrial and to set aside the verdict due to her alleged PTSD flashback; and her motion to "pause" the trial pending her receipt of mental health treatment.

However, regarding appellant's first assignment of error with respect to the sufficiency of the evidence to support her conviction of voluntary manslaughter, I must respectfully depart from the analysis of my colleagues in Part A of the majority opinion.

The parties and the majority concede that the model jury instruction that was used in this case, defining the possible verdicts and the elements the Commonwealth was required to prove for each, was unobjected to and permitted the jury to render a verdict of guilty to voluntary manslaughter. Those two facts should be dispositive of this assignment of error since, by failing to object to the instruction, appellant conceded in the circuit court that the Commonwealth's evidence was legally sufficient to support a potential verdict of voluntary manslaughter and also waived appellate review with respect to any defects in the wording of that instruction or whether it should have been given at all. Thus, on appeal, she may not adopt an inconsistent legal position in that regard. See Rule 5A:18; see also Dufresne v Commonwealth, 66 Va. App. 644, 653, 791 S.E.2d 335, 339 (2016) (*en banc*). This analysis would be the narrowest and best basis for the disposition of this assignment of error. However, although my colleagues in the majority acknowledge these facts and our duty is to decide cases on the narrowest and best grounds, they nevertheless elect to proceed with an analysis that, in my view, is both erroneous and further

confuses an already murky legal landscape with respect to the nature of the offense of voluntary manslaughter.

In fairness to my colleagues, I concede that there are conflicting cases from both this Court and our Supreme Court that paint a rather confusing picture of how "heat of passion" factors into a sufficiency of the evidence analysis with respect to the crime of voluntary manslaughter. However, because the majority's entirely superfluous analysis will add to that confusion and create a host of entirely unnecessary problems for prosecutors and trial court judges and furthermore, because I believe the majority's analysis to be seriously flawed, I feel compelled to offer my view in response. In addition, I fervently disagree with the majority insofar as it finds it necessary to apply our Supreme Court's holding in <u>Blankenship v. Commonwealth</u>, 193 Va. 587, 70 S.E.2d 335 (1952), to the facts of this case.

As the majority notes, appellant's first assignment of error is essentially that because the jury was instructed that in order for them to convict her of voluntary manslaughter, the Commonwealth was required to prove beyond a reasonable doubt that she acted in "heat of passion upon reasonable provocation" and she contends that since the Commonwealth presented no evidence that the law recognizes as legally provocative, since words alone are never legally sufficient to constitute "reasonable provocation," the evidence supporting the verdict was necessarily insufficient as a matter of law.[6]

I begin my response to the majority's flawed analysis where my colleagues begin theirs—with Code § 1-200, which stipulates that "[t]he common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth,

---

[6] Again, I reiterate and note that this assignment of error should be procedurally defaulted for the reasons already stated since by appellant's failure to object to the voluntary manslaughter portion of the instruction, she was conceding that the evidence presented to the jury was sufficient to support that possible verdict.

shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly." The General Assembly has not seen fit to alter the common law definition of voluntary manslaughter and thus trial judges and litigants in homicide cases must rely on precedent to frame jury instructions.

At common law, manslaughter was defined simply as "[t]he unlawful killing of another without malice either express or implied." 4 William Blackstone, Commentaries *190. The model jury instruction used in this case adds as a required element that the killing be accomplished "in the heat of passion upon reasonable provocation." This instruction is based upon several cases cited by the majority that, in my view, incorrectly suggest that what historically was a mitigating circumstance at common law is actually an element of the offense.

"The distinctions between manslaughter and murder, consists in the following. In the former, though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the very essence of murder, is presumed to be . . . manslaughter." 1 Sir Edward Hyde East, A Treatise of the Pleas of the Crown 218 (London, A. Strahan ed. 1803). English common law historically classed manslaughter as "those [killings] which take place in consequence of, 1. Provocation. 2. Mutual combat. 3. Resistance to public officers. 4. Killing in the prosecution of an unlawful or wanton act. 5. Killing in the prosecution of a lawful act, improperly performed, or performed without lawful authority." Manslaughter, A Law Dictionary Adapted to the Constitution and Laws of the United States of America, and the Several States of the American Union; with References to the Civil and Other Systems of Foreign Law (T. & J.W. Johnson, Law Booksellers ed. 1843).

The common law initially did not classify voluntary or involuntary manslaughter as separate categories of homicide and simply considered any killing lacking malice as manslaughter. This included an unintentional killing due to gross negligence, which was just

- 24 -

another factor negating the element of malice in reducing murder to manslaughter. "When death ensues from the performance of a lawful act, it may, in consequence of the negligence of the offender, amount to manslaughter. For instance, if the death has been, occasioned by negligent driving." 1 East, P. C. 263; 1 C. & P. 320 S. C. 9 E. C. L. R. 408; 6 C. & P. 629; S. C. 25 E. C. L. R. 569. Again, "when death ensues, from the gross negligence of a medical or surgical practitioner, it is manslaughter." 1 Hale, P. C. 429; 3 C. & P. 632; S. C. 14 E, C. L. R. 495.

Eventually, manslaughter was categorized as either "voluntary" upon sudden heat and provocation or "involuntary" but in the commission of some unlawful act. See 4 William Blackstone, Commentaries *190-93 ("As to the first or *voluntary* branch: if upon a sudden quarrel two persons fight and one of them kills the other, this is manslaughter . . . for this is one continued act of passion." (emphasis added)); see also 1 Hawk, P. C. 82.

My point here is that, at common law, malice was presumed to exist in every homicide based upon yet another common law presumption that every killing was intentional.[7] Thus, the burden on the defendant to establish sufficient provocation to reduce the offense from murder to manslaughter at common law was a response to the *presumption* of malice, which the common law raised in *every* case of homicide. "[I]t is therefore no answer when express malice is proved . . . and to be available the provocation must have been reasonable and recent, for no words or slight provocation will be sufficient, and if the party has had time to cool, malice will be inferred." Id. (citing 1 Russ. Cr, 440; 1 East, P. C. 239).

---

[7] See, e.g., Rex v. Holt, 7 C. & P. 518 (1836) ("A man must be taken to intend the consequences of his acts."); see also Jordan v. Commonwealth, 181 Va. 490, 493, 25 S.E.2d 249, 250 (1943) ("A man is presumed to intend the natural consequences of his act."); Reese v. Bates, 94 Va. 321, 330, 26 S.E. 865, 869 (1897) ("Every man is presumed to intend the consequences of his own act.").

To complicate matters further, because the common law presumed the existence of malice, the common law practice did not permit manslaughter to be directly charged.[8]  This was because the common law also presumed every killing to be murder, with the defendant required to rebut the presumption of malice by demonstrating that one of the recognized factors negating malice existed.  See 1 Hale, P. C. 455; see also Lewis v. Commonwealth, 78 Va. 732, 733 (1884) ("[M]alice is presumed from the fact of the killing, unaccompanied with circumstances of extenuation; and the burden of disproving malice is upon the accused.").[9]

The phrase "heat of passion" seems to originate in the words of Sir William Blackstone.  In his Commentaries, Blackstone notes that "the difference [between murder and manslaughter] principally consists in this, that manslaughter, when voluntary, arises from the sudden heat of the passions, murder from the wickedness of the heart."  Byrd v. Commonwealth, 89 Va. 536, 538, 16 S.E. 727, 728 (1893) (quoting 4 William Blackstone, Commentaries *138).  However, in describing what constitutes his "voluntary" category of manslaughter, Blackstone includes as examples of "heat of passion" not only a man finding his wife in adultery with another man but also "chance-medley."  4 William Blackstone, Commentaries *139-45 (citing 24 Henry VIII, ch. 5 (1532) (publicizing the first official statement addressing what amounts to, in modern terms, imperfect self-defense)).

---

[8] The General Assembly statutorily modified this common law concept that manslaughter was an offense only derivative of murder and could not be directly charged.  See Code § 19.2-221 ("A grand jury may, in case of homicide, which in their opinion amounts to manslaughter only, and not to murder, find an indictment against the accused for manslaughter . . . .").

[9] In England, the presumption of malice was abolished by The Homicide Act, 1957, 5 & 6 Eliz. 2, c.11, 1 (Eng.).

However, over the last two centuries, "heat of passion upon reasonable provocation" has evolved into the only currently legally recognized factor in the Commonwealth that negates malice.[10]

Our Supreme Court has occasionally reiterated the historically understood relationship between murder and manslaughter.

> All homicide, is in presumption of law, malicious; and of course amounts to murder, unless justified, excused or alleviated; and it is incumbent upon the prisoner to make out, to the satisfaction of the Court and jury, the circumstances of justification, excuse and alleviation. 4 Bl. Com. 201; Honeyman's Case, Add. 148; Bell's Case, Add. 162; M'Fall's Case, Add. 257; Lewis' Case, Add. 282. This presumption of malice, which makes the homicide to be murder, may be repelled by the accused, where the act, though intentional of death, or great bodily harm, was not the result of a cool, deliberate judgment, and previous malignity of heart; but is imputable to human infirmity alone, when death ensues from sudden transport of passion or heat of blood, if upon reasonable provocation, and without malice: for on such proofs, the homicide will be manslaughter.

M'Whirt's Case, 44 Va. (3 Gratt.) 594, 605 (1846).

The majority cites M'Whirt's Case, 44 Va. (3 Gratt.) 594, in support of its analysis and that case and many which follow it accurately reflect the common law as it historically applied. However, both our Supreme Court and this Court have also "defined" voluntary manslaughter in

---

[10] The other common law factors that historically negated the element of malice have either been subsumed within the crime of *involuntary* manslaughter or are no longer recognized at all. For example, notwithstanding its ancient common law roots, imperfect self-defense is not recognized in the Commonwealth to negate the element of malice. See Jackson v. Commonwealth, 98 Va. 845, 848, 36 S.E. 487, 488 (1900) ("With regard to the necessity that will justify the slaying of another in self-defence, it should seem that the party should not have wrongfully occasioned the necessity; for, a man shall not in any case justify the killing of another by a pretence of necessity, unless he were without fault in bringing that necessity upon himself.").

Ironically, England abolished "heat of passion upon sudden provocation" as a mitigatory defense sufficient to convert murder to manslaughter through § 56(1) of the Coroners and Justice Act, which substituted "diminished capacity" and "loss of control" as mitigating factors. See Coroners and Justice Act, 2009, § 56(1) (UK).

a manner that confusingly and erroneously suggests to some, apparently including the drafters of the model jury instruction used in this case and my colleagues in the majority, that "heat of passion upon reasonable provocation" is actually an element of the offense of voluntary manslaughter. See, e.g., Read v. Commonwealth, 63 Va. (22 Gratt.) 924, 937-38 (1872) ("Voluntary manslaughter is *defined* as an intentional killing committed while in the sudden heat of passion upon reasonable provocation."); see also Turner v. Commonwealth, 23 Va. App. 270, 274, 476 S.E.2d 504, 506 (1996) (citing Read, 63 Va. (22 Gratt.) at 937-38); Barrett v. Commonwealth, 231 Va. 102, 105-06, 341 S.E.2d 190, 192 (1986). This reference to "heat of passion upon sudden provocation" as part of a so-called *definition* of voluntary manslaughter was technically correct as long as one remembers that, at the time Read was decided, the burden of proving its existence was the *defendant's* and thus any such "definition" did not equate to a list of elements that the prosecution was required to prove beyond a reasonable doubt and in any event, made little, if any, difference until 1975 and the United States Supreme Court's decision in Mullaney v. Wilbur, 421 U.S. 684 (1975).

Mullaney specifically addressed the common law's presumption of malice, holding that it was unconstitutional to require a defendant charged with murder to prove that he acted "in the heat of passion on sudden provocation" to reduce the homicide to manslaughter. See id. at 703-04. The Supreme Court in Mullaney held that such burden shifting presumptions violated the due process requirement of the Fourteenth Amendment and that the prosecution bears the burden to prove *every* element of the offense(s) charged. See id.; see also Sandstrom v. Montana, 442 U.S. 510, 520-24 (1979).

Post-Mullaney, the test is simple in concept if not always in application—with respect to any and all elements of a crime, the prosecution bears the sole burden of proof to establish the existence of each of those elements beyond a reasonable doubt. However, with respect to

affirmative defenses, such as insanity or self-defense, the burden of persuasion to establish the defense to the extent it raises a reasonable doubt remains the defendant's. See, e.g., Patterson v. New York, 432 U.S. 197 (1977); Rivera v. Delaware, 429 U.S. 877 (1976).

In my view, in the wake of Mullaney, the "definition" of voluntary manslaughter from Read, Barrett, and Turner now immortalized in a model jury instruction, has injected some confusion into the Commonwealth's case law. Specifically, post-Mullaney, these cases muddle whether "heat of passion upon reasonable provocation" is an element of voluntary manslaughter that the prosecution bears the burden of proving beyond a reasonable doubt or more in the nature of a partial affirmative defense to murder for which a defendant has the burden of persuasion. I conclude that in "defining" voluntary manslaughter "as an intentional killing committed while in the sudden heat of passion upon reasonable provocation," Read, Barrett, and Turner were merely restating the historical common law formula for an offense that, until Mullaney, required an element that only the defendant had the burden to prove, namely "heat of passion upon sudden provocation." Post-Mullaney, I do not read any of these cases as changing the common law burden of proof placed upon the Commonwealth and, for the reasons that follow, I believe that the model jury instruction used in this case was erroneous in suggesting otherwise.

Our Supreme Court dealt expeditiously with the issue raised in Mullaney by announcing that:

> [T]he Virginia presumption [of malice] does not cast upon the accused the burden of proving by a fair preponderance of the evidence that he acted in the heat of passion in order to put that critical fact in issue and to require the Commonwealth to negate passion beyond a reasonable doubt. The Virginia burden is satisfied when the accused produces some credible evidence that he acted in the heat of passion. But even if he produces no evidence, he may rely upon the Commonwealth's evidence to secure a manslaughter instruction and an acquittal on the charge of murder, if that evidence indicates he acted in the heat of passion. In practical effect, therefore, the Virginia presumption amounts to

- 29 -

> no more than an inference which the trier of fact is permitted, but is not required, to draw from proven facts.

Hodge v. Commonwealth, 217 Va. 338, 343, 228 S.E.2d 692, 695-96 (1976).

Declaring that presumptions—enshrined in centuries of common law jurisprudence—were all along only permissive inferences may have solved the constitutional problem Mullaney raised for the Commonwealth. However, such re-labeling leaves at least one non-constitutional question unanswered that is relevant to the resolution of this appeal selected by the majority: Since the entire foundation of the crime of manslaughter at common law rested upon two presumptions that are now no more than permissive inferences—the presumptions that every killing of another is both intentional and malicious—what are the elements of voluntary manslaughter that require proof of beyond a reasonable doubt?

In answering that question, it seems logical to begin with what is pretty clearly to me *not* an element of voluntary manslaughter—"heat of passion upon reasonable provocation." In my view, there are at least two reasons why.

First, as already noted, because of the pre-Mullaney presumptions of intent and malice, the burden of establishing "heat of passion upon sudden provocation" at common law has *always* been a burden placed on the defendant and has *never* been the responsibility of the prosecution to prove. Only the model jury instruction used in this case has ever expressly stated otherwise and I do not read any post-Mullaney case from our Supreme Court, to have placed any burden on the Commonwealth to negate beyond a reasonable doubt, an element of murder in order to obtain a conviction for the lesser-included offense of voluntary manslaughter. Although the model jury instruction cites Read and its progeny as its source, as already noted, the "definition" found in Read et al. cannot be synonymous with the elements for which the Commonwealth has the burden of proof. This is because, at the time Read was decided and initially created the "definition" of voluntary manslaughter that has been carried forward by both appellate courts of

- 30 -

the Commonwealth into the jury instruction used in this case, the burden to establish the "definitional" element of "heat of passion upon sudden provocation" was clearly still the burden of the defendant.

Second, it seems to me that an even more dispositive argument that "heat of passion upon reasonable provocation" is not properly an element of voluntary manslaughter is that, if such were the case, the model jury instruction used here is infirm for yet another reason. If "heat of passion upon reasonable provocation" is an element they are required to prove, the prosecutors of the Commonwealth will be startled to learn that the offense of voluntary manslaughter is no longer an option as a possible alternative verdict in a murder case since voluntary manslaughter can no longer fill its centuries long role as a lesser-included offense of murder under the Blockberger test. See Blockberger v. United States, 284 U.S. 299, 304 (1932) ("The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."). For both of these reasons, I conclude that the "definition" of voluntary manslaughter offered up by Read and its progeny is not a laundry list of the elements of voluntary manslaughter that the Commonwealth must prove beyond a reasonable doubt.

Applying the statutory mandate for construction of the common law found in Code § 1-200, coupled with the constitutionally mandated removal of the presumptions of intent to kill and malice in every homicide, I conclude that the definitional elements of voluntary manslaughter compatible with the common law as circumscribed by the Constitution through Mullaney are, to only slightly paraphrase Blackstone: "[t]he [intentional] killing of another [in the absence of sufficient evidence of] malice[.]" See 4 William Blackstone, Commentaries *190. Since the existence of malice either express or implied is the only difference between

- 31 -

second-degree murder and voluntary manslaughter and it would be absurd to suggest that the Commonwealth is ever required to establish a *lack* of evidence beyond a reasonable doubt, it follows that an intent to kill and the resulting death of the victim are the only elements the Commonwealth actually needs to prove beyond a reasonable doubt to convict of voluntary manslaughter. For these reasons, I conclude that the model jury instruction used in this case did not correctly state the law regarding the elements of voluntary manslaughter because "heat of passion upon reasonable provocation" is not properly an element of voluntary manslaughter that need be proven beyond a reasonable doubt by the Commonwealth. Rather, "heat of passion" is properly relevant only to a charge of murder and operates only as a partial affirmative defense to offset any inference of malice—an element only of murder and not manslaughter.

This brings me to the manner in which the majority resolves this assignment of error. The majority avoids having to decide the question of whether reversal is required when the evidence is insufficient to establish that the Commonwealth failed to prove the existence of an "element" that negates another element that the Commonwealth was required to prove for a greater offense—namely malice. The majority accomplishes this by concluding that the jury instruction is "the law of the case"[11] and relying upon our Supreme Court's decisions in a number of cases decided before Mullaney, in particular, Blankenship v. Commonwealth, 193 Va. 587, 70 S.E.2d 335 (1957), and Connell v. Commonwealth, 144 Va. 553, 131 S.E. 196 (1925).

In essence, Blankenship and Connell hold that, in a murder case where no evidence whatever was presented to warrant a reduction in the offense from murder, reversal of a

---

[11] The majority relies upon our Supreme Court's decision in Wintergreen Partners, Inc. v. McGuirewoods, LLP, 280 Va. 374, 379, 698 S.E.2d 913, 916 (2010), for this proposition. In that case the Court held that by failing to object to a jury instruction, the appellant could not complain that the jury had followed it. But, I do not read the Supreme Court's holding in that case to require reversal when, as here, the converse is true and the evidence is sufficient as a matter of law as it actually exists.

conviction for a less serious offense than the jury was instructed on is not warranted because the defendant suffered no prejudice by being convicted of a lesser offense than the law should have permitted. See Blankenship, 193 Va. at 593, 70 S.E.2d at 338; Connell, 144 Va. at 556-57, 131 S.E. at 197.

Applying Blankenship, the majority begins its analysis by noting that it undertakes its "analysis without engaging in impermissible appellate fact-finding" and then proceeds to do exactly that by concluding that "based on the permissible inferences that a rational factfinder could draw from the evidence in the record, we cannot conclude that no rational factfinder could have found appellant guilty of second-degree murder." What seems to have escaped the majority here is the fact that a rational factfinder *declined* to draw those permissive inferences and reach the verdict my colleagues in the majority evidently would have preferred.

"In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Smith-Adams v. Fairfax Cty. Sch. Bd., 67 Va. App. 584, 590, 798 S.E.2d 466, 469 (2017) (quoting Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991)). Despite this admonition, the majority relies upon Blankenship, Connell, and the permissible inference that "malice may be inferred from the deliberate use of a deadly weapon" to opine that "we cannot conclude that no rational factfinder could have found appellant guilty of second degree murder."

In doing so, the majority apparently overlooks the fact that in this case, a rational factfinder actually *rejected* the inference that the majority relies upon thereby implicitly transforming the permissible inference back into a de facto pre-Mullaney unrebutted presumption. The majority also ignores the standard of review in legal sufficiency cases which is to view the evidence in the light most favorable to the prevailing party, in this case the

- 33 -

Commonwealth, *only insofar as it supports the verdict*. Appellate courts may *not* consider evidence that was expressly or implicitly rejected by the factfinder. See, e.g., Courtney v. Commonwealth, 281 Va. 363, 368, 706 S.E.2d 344, 347 (2011) ("As we have said on many occasions, . . . the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"); Cobb v. Commonwealth, 152 Va. 941, 953, 146 S.E. 270, 274 (1929) ("[I]t is not for this court to say that the evidence does or does not establish his guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion."). This deferential appellate standard "applies not only to findings of fact, but also to any reasonable and justified inferences the fact-finder may have drawn from the facts proved." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63-64 (2010).

The verdict in this case implicitly indicates that the jury was not satisfied that the element of malice was proven beyond a reasonable doubt. Thus, the starting point for any sufficiency analysis must be based upon the sufficiency of the evidence for the crime that the appellant was actually convicted of—not what the appellant might have been convicted of if my colleagues had been sitting in the jury box. By ignoring that fact in its analysis and deciding that because the Commonwealth presented sufficient evidence from which the jury *could* have found the defendant guilty of the greater offense of second-degree murder and despite its disclaimer to the contrary, the majority's analysis necessarily assumes that malice was *presumed* rather than merely inferred by the use of the deadly weapon and further that this presumption could not have been rebutted by evidence of "heat of passion upon reasonable provocation" since there was none. However, as already explained, the majority's analytical approach is no longer compatible with due process. The majority's Blankenship based analysis assumes that the jury either ignored the instruction regarding heat of passion or based its verdict entirely on a desire for some

- 34 -

measure of leniency toward the appellant.[12]  My colleagues' analysis ignores Mullaney and the fact that the evidence of malice in this case was entirely based upon the use of a deadly weapon from which the jury *could* have drawn an inference of malice but *was not required to do so* irrespective of whether there was any evidence of "heat of passion upon reasonable provocation."  The fact that the jury chose *not* to draw a permissive inference is binding upon us as we conduct our sufficiency review, and the majority is not entitled to do otherwise on appeal. Our standard of review constrains us from considering the use of the weapon as evidence of malice, even in the light most favorable to the Commonwealth.  Moreover, I note that the holdings of Connell and Blankenship are likely no longer valid precedent because their analysis is necessarily dependent upon a burden-shifting presumption later deemed unconstitutional by Mullaney and its progeny.  See Blankenship, 193 Va. at 591, 70 S.E.2d at 337 ("[T]he burden was on the accused to produce evidence showing justification or excuse for the homicide.").  I see no need to head down the slippery slope that the majority's reliance on Blankenship creates for future sufficiency of the evidence analyses where we will now consider all the evidence presented, including evidence implicitly, or perhaps even explicitly, rejected by the factfinder, and apply a "no harm, no foul" analysis if the verdict *might* have been one of guilty of a more serious crime.

For the reasons previously stated, I conclude that the model jury instruction defining the offense of voluntary manslaughter is an erroneous statement of the law.  However, I would nevertheless affirm the judgment for two reasons, one of which I have already stated—appellate

---

[12] While it is certainly possible that the jury simply chose to overlook overwhelming evidence that the appellant was guilty of murder in what amounts to an act of grace or leniency to the appellant, such speculation has no place in a sufficiency analysis.  "[B]ecause we are more careful than most states to protect the inviolability and secrecy of jurors' deliberations, a court, in a case like this [involving internally inconsistent verdicts], is unlikely to discover what motivated the jury."  Reed v. Commonwealth, 239 Va. 594, 598, 391 S.E.2d 75, 77 (1990) (internal quotation marks and citation omitted); see also United States v. Powell, 469 U.S. 57, 65 (1984).

review has been waived because the appellant has taken inconsistent legal positions in the circuit court and on appeal.

The second reason I would affirm is that, even if we were able to address this assignment of error, it seems to me that when appellate courts review a trial record to determine if the evidence is sufficient as a matter of law, the "law" that ought to frame that review is the law as it actually existed at the time of the offense, not the "law" as erroneously conceded by the parties as I believe the situation to be here. See Moonlight Enters. v. Mroz, 293 Va. 224, 234 n.5, 797 S.E.2d 536, 541 n.5 (2017) ("[W]e are not bound by a party's concession of law, or the parties' agreement on an issue of law, . . . Simply put, litigants cannot define Virginia law by their concessions." (internal citations omitted)). To hold otherwise would result in either reversal and dismissal based upon insufficient evidence to support a non-existent crime or reversal and remand for a new trial on the grounds that the jury departed from its incorrect instructions, despite reaching a verdict consistent with the law as it actually exists, with the ideal result of the new trial being that a second jury would apply the same law the first jury was reversed for applying.

For all of these reasons and because of the presumably unintended mischief that I predict will be created by the analysis of the majority, I decline to join my colleagues but would nevertheless affirm the judgment below.